The **DETROIT EDISON COMPANY,**
Petitioner,

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,**
**Respondent.**

No. 73–1552.

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 30, 1973.

Decided April 18, 1974.

Harry H. Voigt, Washington, D. C., for petitioner; Arvin E. Upton, Henry V. Nickel, Washington, D. C., on brief; LeBoeuf, Lamb, Leiby, & MacRae, Washington, D. C., Leon S. Cohan, Peter A. Marquardt, The Detroit Edison Co., Detroit, Mich., of counsel.

James R. Walpole, Dept. of Justice, for respondent; Wallace H. Johnson, Asst. Atty. Gen., Edmund B. Clark, Martin Green, Attys., Dept. of Justice, Washington, D. C., on brief.

Before WEICK, PECK and MILLER, Circuit Judges.

JOHN W. PECK, Circuit Judge.

This case is before us upon petition by the Detroit Edison Company for judicial review pursuant to § 307(b)(1) of the Clean Air Act, 42 U.S.C. § 1857h–5(b)(1) (1970), of a May 14, 1973, regulation promulgated by the Administrator of the Environmental Protection Agency (EPA). The May 1973 regulation specifically amended an earlier EPA regulation promulgated in October of 1972 although the subject matter thereof had been neither previously published nor the subject of a public hearing. The EPA terms the amendment a "clarification" of the October 1972 regulation, while the petitioner Detroit Edison characterizes it as a "revision" to the State's plan, but more than a matter of semantics is involved. A revision would necessitate compliance with the necessary procedural requirements in promulgating the May 1973 regulation, while a mere clarification would not. We conclude that the amendment amounted to a revision.

In early 1972, pursuant to the requirements of § 110 of the Clean Air Act,[1] 42 U.S.C. § 1857c–5(a) (1970), the State of Michigan submitted a plan describing its implementation of Federal primary (health-related) and secondary (welfare-related) ambient air quality standards. The EPA Administrator reviewed the plan and in May of 1972 timely ap-

---

1. For a discussion of the history and structure of the Clean Air Act, see Buckeye Power, Inc. v. EPA, 481 F.2d 162, 165–167 (6th Cir. 1973).

proved it with certain exceptions. 37 Fed.Reg. 10842 (1972). Included in the plan as submitted was a provision referred to as "R 336.49." This provision is entitled "Emission of sulfur dioxide from power plants" and R 336.49(1) [2]

2. R 336.49. Emission of sulfur dioxide from power plants.

Rule 49. (1) It is unlawful for a person to burn in a power plant fuel which does not comply with either the sulfur content limitation of table 3, or which when burned results in sulfur dioxide emissions exceeding an equivalent emission rate as shown in table 4, unless the following conditions are met:

(a) The source of fuel burning is not subject to federal emission standards for new stationary sources.

(b) An installation permit, if required by part 2, has been approved by the commission before August 17, 1971.

(c) The user furnishes evidence that the fuel burning does not create, or contribute to, an ambient level of sulfur dioxide in excess of the applicable ambient air quality standards. The evidence shall be furnished to the commission not later than July 1, 1973 and shall include 12 months of air quality data or equivalent information satisfactory to the commission. The method of obtaining the evidence shall be approved by the commission or its representatives who shall be given the opportunity to calibrate and check the performance of monitors without prior notification of the owner.

(d) The user is operating in compliance with an order, stipulation or variance from the commission.

(2) Notwithstanding the provisions of subrule (1), an exception from the limitations of table 3 will not be permitted after January 1, 1980 unless specific authorization is granted by the commission.

(3) A person responsible for operation of a source which on July 1, 1973 is using fuel with a sulfur content in excess of that allowed to be burned on July 1, 1978 as listed in table 3, or which on July 1, 1973 is emitting sulfur dioxide in excess of the equivalent emission for that fuel as shown in table 4, shall submit to the commission not later than January 1, 1974 a written program for compliance with this rule. This requirement does not apply to a source for which the commission has approved an exception to table 3 under the provisions of subrule (1).

\* \* \* \* . \* \*

(7) The use of fuels having sulfur contents as set forth in this rule shall not allow degradation in the mass rate of particulate emission unless otherwise authorized by the commission. The commission may require source emission tests which may be performed by or under the supervision of the commission at the expense of the owners and may require the submission of reports to the commission both before and after changes are made in the sulfur content in fuel.

TABLE 3. SULPHUR IN FUEL LIMITATIONS FOR
FUEL BURNING EQUIPMENT

| Plant Capacity (a) 1000 lbs. Steam Per Hour | Maximum Sulfur Content in Fuel (b) Percent by Weight (c) | |
| --- | --- | --- |
| | July 1, 1975 | July 1, 1978 |
| 0–500 | 2.0 | 1.5 |
| Over 500 | 1.5 | 1.0 |

TABLE 4. EQUIVALENT EMISSION RATES

| % Sulfur in Fuels (c) | Parts Per Million by Volume Corrected to 50% Excess Air | | Pounds of Sulphur Dioxide Per Million BTU of Heat Input | |
| --- | --- | --- | --- | --- |
| | Solid Fuel (d) (12,000 BTU/lb) | Liquid Fuel (e) (18,000 BTU/lb) | Solid Fuel (d) (12,000 BTU/lb) | Liquid Fuel (e) (18,000 BTU/lb) |
| 1.0 | 590 | 420 | 1.6 | 1.1 |
| 1.5 | 890 | 630 | 2.4 | 1.7 |
| 2.0 | 1180 | 840 | 3.2 | 2.2 |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

thereof details that it shall be unlawful to burn fuel whose sulfur content exceeds the levels established for July 1975 and July 1978 by a Table 3 (of R 336.-49(7)) or whose sulfur dioxide emissions exceed the levels of Table 4 (of R 336.49(7)). R 336.49(1) further provides that variances or exemptions to the requirements of Tables 3 and 4 may be approved if the emission source furnishes evidence no later than July 1, 1973, that it does not create or contribute an ambient level of sulfur dioxide in excess of the applicable national ambient air quality standards. R 336.49(3) provides that persons operating sources in July 1973 which exceed either the Table 4 emission level or the July 1978 sulfur content level of Table 3 must submit written compliance schedules no later than January 1, 1974.

The submission of individual compliance schedules by January 1, 1974, was one of the Administrator's objections to the Michigan plan for the reason that this date was later than the due date for the State's first semiannual progress report on the implementation plan. 37 Fed.Reg. 10842, 10873 (1972). According to 40 C.F.R. § 51.15(a)(2), individual compliance schedules must be submitted no later than the due date for that first progress report. In addition, in his comments relevant to all the states' plans, the Administrator also objected to the several proposals regarding variances:

#### "Optional Control

"Several State plans include regulations under which a source owner or operator could be exempt from compliance with an applicable emission limitation if he can show that emissions from the source will not interfere with attainment or maintenance of the national standards. The Administra-

tor neither approves nor disapproves such optional control features. States are advised, however, that action taken to allow any such exemptions will constitute revision of a State plan and therefore will be subject at that time to the Administrator's approval." 37 Fed.Reg. 10842, 10845–46 (1972).

Subsequently, pursuant to § 110(c) of the Act, 42 U.S.C. § 1857c–5(c) (1970), the Administrator published his proposed revisions for those portions of the plan that he disapproved. 37 Fed.Reg. 11826, 11835–36 (June 14, 1972). Public hearings followed on the EPA proposals with the result that in October of 1972 revised regulations were promulgated. 37 Fed.Reg. 23085, 23089 (October 28, 1972). The revised regulations required, in relevant part, that:

"§ 52.1175 Compliance schedules.

\* \* \*

"(b) Federal compliance schedule. (1) Except as provided in subparagraph (2) of this paragraph, the owner or operator of a stationary source subject to R 336.49 . . . shall comply with such regulation on, or before, December 31, 1973 . . . .

\* \* \*

"(2) Any owner or operator of a stationary source subject to subparagraph (1) of this paragraph may, no later than 120 days following the effective date of this paragraph, submit to the Administrator for approval a proposed compliance schedule that demonstrates compliance with R 336.-49 as expeditiously as practicable but no later than the dates specified in R 336.49(7) . . . . ."

\* \* \*

This October 1972 regulation was not challenged by Detroit Edison and is not being challenged here.[3]

---

3. The time to challenge the October regulation has expired. See, § 307(b)(1) of the Act, 42 U.S.C. § 1857h–5(b)(1) (1970).

After the October 1972 regulation was published, the EPA claimed that it detected misinterpretations of the regulation and accordingly on May 14, 1973, published an amendment to the October 1972 regulation that replaced the general reference to compliance with R 336.49 with the specific reference to "the emission limitations in table 3 or 4 of R 336.49." In addition, the date for achieving compliance was extended from December 31, 1973 to January 31, 1974, for the claimed purpose of maintaining consistency with the provisions of 40 C. F.R. § 51.15(c). 38 Fed.Reg. 12711, 12712–13 (1972).

The petitioner's position can be summarized as follows. Under R 336.49 the sulfur limitations are not effective until July 1, 1975 and July 1, 1978, and those limitations do not apply until 1980 to sources obtaining a variance. Under the May 1973 regulation, all sources not submitting compliance schedules are required to comply with the 1978 sulfur limitations by January 31, 1974. In addition, the 1980 compliance date for sources obtaining a variance is eliminated. Petitioner presently has an application for a variance pending.

In examining the contentions of the parties, we first observe that the actual emission limitations are set forth in Tables 3 and 4 of R 336.49. The other parts of R 336.49 refer to schedules for achieving compliance with the limitations. In this respect, the EPA argues that there are three alternative courses of action available to emission sources, namely: (1) to obtain a variance from the requirements pursuant to R 336.-49(1) [4]; (2) to submit a certification to the EPA that the source is, or will be by December 31, 1973, in compliance with the requirements [5]; or, (3) to submit to the EPA a compliance schedule showing how compliance with Table 3 or 4 will be accomplished.[6] Although our reading of the regulations as amended through October of 1972 indicates that these alternatives are available to the petitioner, we cannot find authority therefore from a reading of the regulations as amended in May of 1973.

■■ It is well settled that an agency's interpretation of its regulations is properly entitled to deference by the courts unless it is plainly erroneous or inconsistent with the regulations. Udall v. Tallman, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); Gulf Oil Corp. v. Hickel, 140 U.S.App.D.C. 368, 435 F.2d 440 (1970). But by changing the language of compliance to specify the emission limitations of Tables 3 and 4, we can only conclude that the May 1973 regulation specifically excludes the variance alternative indicated at R 336.-49(1) from its purview. In contrast, the October 1972 regulation, by its broad language in referring to the entire R 336.49, encompasses the alternative of obtaining a variance. If, as the EPA would have us believe, the May regulation does not in fact alter the terms of the October regulation and allows the petitioner to proceed as if three alternatives exist, then we are faced with the fact that there is no controversy before us.[7] It would follow then that

---

4. See footnote 2, *supra*. Advance approval of variances was specifically avoided by the Administrator, 37 Fed.Reg. 10842, 10845–46 (1972), for the apparent reason that each variance must be evaluated as a revision to the basic implementation plan and must pass the same scrutiny as a revision pursuant to 40 C.F.R. § 51.6 (1972).

5. See § 52.1175(b)(1), 37 Fed.Reg. 23085, 23089 (October 28, 1972).

6. See § 52.1175(b)(2), id.

7. We are not unaware of the fact that although the EPA has stated that it would not bring an action against the petitioner for Federal enforcement pursuant to § 113 of the Act, 42 U.S.C. § 1857c–8 (1970), the petitioner is subject to a civil action under § 304 of the Act, 42 U.S.C. § 1857h–2 (1970).

the May regulation is unnecessary except as regards the change in the compliance date which is apparently conceded by the petitioner to be a valid administrative change.

Giving merely the meaning its plain language imparts, it is clear that the May 1973 regulation in fact deletes the variance alternative from the provisions of the implementation plan and thus effects a substantial change thereto. Since the Administrator has not complied with the informal rulemaking requirements of the Administrative Procedure Act (APA), 5 U.S.C. § 553 (1967), the promulgation of the May 1973 regulation must be vacated and the case remanded with instructions to comply with the APA. Buckeye Power, Inc. v. EPA, 481 F.2d 162 (6th Cir. 1973).

The EPA urges that certain statutory exceptions to APA requirements are applicable but our view is that the mere invocation by EPA of the statutory exceptions for interpretative rules is not dispositive as to whether the general rulemaking requirements of the APA are applicable. "The particular label placed upon [a regulation] is not necessarily conclusive, for it is the substance of what the Commission has purported to do and has done which is decisive." Columbia Broadcasting System, Inc. v. United States, 316 U.S. 407, 416, 62 S.Ct. 1194, 1200, 86 L.Ed. 1563 (1942). Neither can the Administrator justify the lack of notice and opportunity for public comment on the grounds that such is "impracticable, unnecessary, or contrary to the public interest." This exception, stated in 5 U.S.C. § 553(b)(B), is inapplicable as well because of the substantial impact of the regulation in issue. And the EPA has not argued that promulgation of the regulation was based on purposes of exigency.

The approval of the May 14, 1973, regulation by the Administrator is vacated and the cause is remanded to the Agency.