UNITED STATES of America,
Plaintiff-Appellee,

v.

Patrick A. THOMPSON, Miche M. Thompson, Richard D. Hawkins, Harry J. Beck, Leslie Brown, Paul R. Moyer, Lark Latch, Rebecca Margolis, Holland W. Shepherd, Spencer W. Cunningham, Bill J. Sears, and Steven Kay, Defendants-Appellants.

Nos. 79–1848 to 79–1855 and 79–1857 to 79–1861 (Trial Group M).

United States Court of Appeals,
Tenth Circuit.

June 17, 1982.

Dissenting Opinion Aug. 9, 1982.

Rehearing Denied Aug. 11, 1982.

John S. Evangelisti of LaFond & Evangelisti, Denver, Colo., (Jonathan L. Olom, Denver, Colo., Tim Correll, Denver, Colo., Cathlin Donnell of Kelly, Haglund, Garnsey, Kahn & Donnell, Michael G. Katz, Federal Public Defender, and Peter R. Bornstein, Denver, Colo., on the briefs), for defendants-appellants.

Nancy E. Rice, Asst. U. S. Atty., D. Colo., Denver, Colo. (Joseph F. Dolan, U. S. Atty., Denver, Colo., with her on the brief), for plaintiff-appellee.

Before SETH, Chief Judge, and HOLLOWAY, McWILLIAMS, BARRETT, McKAY, LOGAN and SEYMOUR, Circuit Judges.

On Petition For Rehearing En Banc

SETH, Chief Judge.

This group of cases is a part of a series of 86 appeals from convictions for violating 42 U.S.C. §§ 2278a(a) and (b) and 10 C.F.R. §§ 860.3, 860.5(a), and 860.6 by seeking to force entry on the Rocky Flats Plant site.

Appellants in Trial Group M were arrested within the 100-foot wide easement surrounding the railroad tracks at Rocky Flats. For the facts pertinent to this location, see *United States v. Dukehart,* 687 F.2d 1301 (10th Cir.), filed this date. For a discussion of post-arrest and pretrial proceedings, see *United States v. Seward,* 687 F.2d 1270 (10th Cir.), filed this date.

In each of the appeals the defendants have challenged the application of the cited statute to the entry on the plant site for which they are charged. The challenges are directed to the regulation adopted by the agency pursuant to the Act, and especially to its implementation and its application to Rocky Flats and to the arrest sites.

Some further recitation of the facts is necessary although some repetition results. Thus the defendants were arrested and charged with unlawful entry on the Rocky Flats Plant site. This was part of an attempted entry involving several hundred persons as a protest on April 29. The record shows that defendants and others intended to go upon the facility at several entrances in large groups. There is, of course, no element of mistake or inadvertence and no error as to the location of the boundary. There were lines drawn on the roadway; there were the warning signs; and the defendants were warned verbally, once by the security guards and once by the deputy marshals at the entrances. The defendants were given an opportunity to withdraw before they were arrested. That they had actual notice is beyond question. It is clear that the appellants were sincere in their views and sincere in their desire to be arrested. However, they now challenge not the fact of their unauthorized entry, but challenge the federal criminal penalty imposed. Trespassers at the site had theretofore been arrested by officers of Jefferson County, Colorado rather than by federal officers and were charged under state law.

The original Rocky Flats site was condemned in 1952, and this included the west access road easement. The railroad right of way was condemned in 1954 for the government to build the railroad to the plant. The remaining acreage apparently was purchased in 1974 or 1975. The inner area around the original plant itself was posted in 1952 with typical "no trespassing" signs. As the site was enlarged from time to time the boundaries were also posted. The central area at Rocky Flats is surrounded by an eight-foot chain link fence with guardhouses. This was built about 1952. The record shows that the outer boundaries of the site were fenced and posted with standard red signs since at least 1975. Thus the entire tract as it now exists was posted with the standard "no trespassing" signs several years before 1979. The new type of signs prescribed by the applicable regulation were moved from an inner perimeter to new locations (where the standard signs were already placed) on April 25, 1979.

In years past the Jefferson County officers at the request of the plant officials would remove demonstrators from the railroad tracks, and would make arrests of trespassers when a complaint was issued by the AEC. Trespassing laws were enforced.

Some years ago there appeared to be need for a federal criminal penalty for unlawful entry into AEC facilities. Thus Congress enacted 42 U.S.C. § 2278a(a) which authorized the AEC to issue regulations relating to entry and the introduction of weapons or explosives into its facilities. A prescribed posting was directed and penalties were set. The Commission in 1963 after notice and opportunity for a hearing adopted such regulations. There is no challenge to these regulations in these appeals. The regulations appear as 10 C.F.R. §§ 860.1, et seq., hereinafter "the regulation."

Appellants were charged with acts in violation of 42 U.S.C. § 2278a(a), which in part reads:

"(a) The Commission is authorized to issue regulations relating to the entry upon or carrying, transporting, or otherwise introducing or causing to

be introduced any dangerous weapon, explosive, or other dangerous instrument or material likely to produce substantial injury or damage to persons or property, into or upon any facility, installation, or real property, subject to the jurisdiction, administration, or in the custody of the Commission. Every such regulation of the Commission shall be posted conspicuously at the location involved."

Sections 2278a(b) and (c) provide the penalties.

The initial and apparently only agency implementation of 42 U.S.C. § 2278a(a) was accomplished by the promulgation and adoption of 10 C.F.R. §§ 860.1, et seq., in 1963. This appears to be the only rule making by the agency. This regulation was properly adopted and published, and there is no challenge to it in these proceedings.

■ We hold that this regulation, part 860, contained all the necessary elements to support the prosecutions. This was *the* rule making, the only rule making, and it was sufficient in itself.

To consider part 860 and its several sections in this light the following quotations may be useful.

Under § 860.2—Scope, it is provided:

"The regulations in this part apply to all facilities, installations and real property subject to the jurisdiction or administration of the Department of Energy or in its custody which have been posted with a notice of the prohibitions and penalties set forth in this part."

Section 860.3 provides for the ban on trespass.

Section 860.7 relates *only* to the effective date:

"The prohibitions in §§ 860.3 and 860.4 shall take effect as to any facility, installation or real property on publication in the FEDERAL REGISTER of the notice designating the facility, installation or real property and posting in accordance with § 860.6."

Section 860.5—Penalties.

Section 860.6—Posting:

"Notices stating the pertinent prohibitions of § 860.3 and § 860.4 and penalties of § 860.5 will be conspicuously posted at all entrances of each designated facility, installation or parcel of real property and at such intervals along the perimeter as will provide reasonable assurance of notice to persons about to enter."

The regulation thus prohibits unlawful entry on AEC facilities, prohibits the introduction of weapons and explosives, recites the penalties, describes in detail the posting to be done, provides that notice of designation be published in the *Federal Register*, and sets an effective date for the "prohibitions."

The subject is uncomplicated. The regulation states that it is for the protection of facilities of the AEC and covers the substantive elements. The matter relates to the protection of public property and is a proprietary function.

Congress was concerned with actual notice as 42 U.S.C. § 2278a(a) directs that posting be "at the location involved." The regulation provides that the signs be posted "at all entrances of each designated facility . . . and at . . . intervals along the perimeter." It also states what shall appear on the signs. These were the "new" signs at Rocky Flats.

The regulation also states that it applies to *all* AEC facilities "which have been posted with a notice of the prohibitions and penalties set forth in this part." Thus posting starts the application of the regulation as such.

The "prohibitions" in the regulation "shall take effect as to any facility . . . on publication in the FEDERAL REGISTER of the notice designating the facility . . . and posting . . . ."

The issues in these appeals center upon the posting, especially a change in location

of a certain type of sign within the Rocky Flats facility, and upon another notice of designation made on April 13. These signs had been moved before and the facility had been "noticed" several times before the 13th. As mentioned above, the entire tract had long been posted with "no trespassing" signs. Shortly before the arrests a new kind of sign thus appeared at the places which were to become the arrest sites in addition to or to replace the old "no trespassing" signs.

It is apparent from the regulation that it was the *time* element, the *effective date*, which was postponed. It does not appear unusual that the effective date of a regulation or a statute is postponed until some future time or some future event. This is a typical provision, and that was all that was done here. The effective date was so postponed until the *notice* of designation was published and the facility was posted. The postponement was thus for *notice* purposes—notice by publication and actual notice—on the ground. This purpose or reason also does not appear to be unusual especially for a trespass regulation. This in substance is no different than had the regulation provided that it would be effective on a stated date.

■ Some of the parties take the position that there should have been another hearing before the effective date provided in the regulation could be the effective date as to Rocky Flats. It would thus follow, for all practical purposes, that had any event, or perhaps even a delayed date been provided for Rocky Flats, a second hearing would be necessary. *All facilities* were considered during the adoption of the regulation, and the delayed date was prescribed for Rocky Flats as it was for all facilities. The time element was so provided for. But more important was the fact that the delay was to accomplish *notice*—especially by placing the signs. This seems like a perfectly valid reason.

Obviously someone had to decide that the *time* had come *at Rocky Flats* for posting and publication of notice. This would seem to be a local event and not a matter of general application. The regulation contemplated that the notice of designation could be "of the facility," thus by using the *name* of the facility, and this was done. The publication in 1965 was thus of "Rocky Flats." (There was also a property description included which was surplusage.) The "designating the facility, installation or real property" was done in 1965 and this aspect was then complete.

■ The time selection and the functions of posting and publication are local notice provisions and should not be elevated to matters of substantive rule making, legislative rule making, or any kind of rule making. The acts of placing the signs and notice publication are in reality nothing more than the execution of the regulation by those in the field charged with such administrative duties. Again, these are acts of notice and are administrative functions at the end of the administrative chain. The vast number of agency actions of this nature cannot be described as rule making, and instead are part of the day-to-day functions of the local officials since all the substantive matters had theretofore been decided.

■ We cannot focus as defendants urge on the events of April 13 and April 29, and apply a geographical test—the move of the new type of trespassing sign to the place where the old "no trespassing" signs were located created an offense where there had been none before. This analysis would have some appeal had nothing taken place before. All the facilities had been considered before. Rocky Flats had been considered before, and in fact everything of any significance had taken place before. We cannot center such a non-event at the end of a series of significant events.

The regulation was a complete package, regularly adopted, unchallenged, containing all the substantive elements and the administrative details of any substance as well.

This was *the rule making*, all the rule making, and was all that was required. Only the *time* was left unsaid—the effective date. And, again, this was a notice function of no greater or different consequence than had a date been inserted.

■ The defendants are urging that a second hearing is required, but have shown only that several administrative acts were necessary locally to carry out the notice provisions. The regulation as to all facilities was adopted in 1963. This may have been a long time ago, but this would not appear to be an adequate reason for another hearing or one as to Rocky Flats alone. The defendants are bound by what their predecessors, who we must assume were of skill and sincerity equal to that of the defendants, may have done or not done during the consideration of the regulation as it related to Rocky Flats in 1963.

The regulation was thus the rule making under *Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944). This was the exercise of the delegated authority to make rules of general application. The regulation contained the only matters of general application. The action covered the subject with nothing of substance remaining to be done. *See Batterton v. Francis*, 432 U.S. 416, 97 S.Ct. 2399, 53 L.Ed.2d 448 (1976), and *General Electric Co. v. Gilbert*, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976).

■ In *Pacific Gas & Electric Co. v. FPC*, 506 F.2d 33 (D.C.Cir.1974), the court said in Part II, referring to the Administrative Procedure Act (5 U.S.C. §§ 551 et seq.):

"Congress recognized that certain administrative pronouncements did not require public participation in their formulation. These type of pronouncements are listed in section 553(b)(A) and include 'general statements of policy.'"

It would appear that other and subsequent acts such as the designation notice, if it is anything more than an administrative act provided for already in part 860, are "pronouncements" comparable to those listed and thus excepted by section 553(b)(A). *See also Noel v. Chapman*, 508 F.2d 1023 (2d Cir. 1975), which concerned existing discretion of district I.N.S. directors. A useful example of when rule making is involved is contained in *Detroit Edison Co. v. United States Environmental Protection Agency*, 496 F.2d 244 (6th Cir. 1974). *See Rowell v. Andrus*, 631 F.2d 699 (10th Cir. 1980).

The defendants place great reliance on *Joseph v. United States Civil Service Commission*, 554 F.2d 1140 (D.C.Cir.1977). The Commission there had issued a list of cities where employees were excepted from the Hatch Act. Four years later another city not theretofore considered was added. The court held that the addition to the list of a new or additional city required a hearing. The point is, of course, that something entirely new, a new city, was added in *Joseph* which had not been considered before. This is quite different from the case before us where all had been considered before, all places had been considered before, and the regulation applied to all. The draft of the regulation was published in the *Federal Register* in January of 1963 together with excerpts from 42 U.S.C. § 2278a(a) directed to "any facility."

Again, the postponement of the effective date until the notice aspects provided in the regulation were accomplished does not create the need for a second hearing.

■ Unauthorized entry onto Rocky Flats in the past was contrary to law, and offenders have been punished. The site was always fenced and posted with "no trespassing" signs at the boundaries. Everything was also done through the years in accordance with the substance and the procedure provided in the regulation. The defendants would make it appear that individuals were free to come and go at will on Rocky Flats before the regulation's effective date, but this was not the case. It was then an offense under state law. With the regulation entry onto Rocky Flats *also* became a federal offense. The appellants

were, of course, charged and convicted of the federal offense.

■ If a second hearing were held all that it could cover would be the question as to whether unauthorized entry onto Rocky Flats should be prosecuted under federal law as an alternative to prosecution under state law. The act was illegal and punishable in a criminal action in any event. The question thus would be which sovereign should bring the charge. Some of the defendants in these actions were involved in previous incidents at least at the railroad tracks which took place frequently during the previous years. The persons who had then entered were removed by the county officers and some were prosecuted under state law as we have seen. These individuals would be in a position to express a view as to state law versus federal law; however, this subject does not appear to be one which could be considered at a hearing in a constructive way or should be considered as a reason for a hearing at all. The record shows that the protesters from time to time had conferences with the protective officers. A conversation was had about the April demonstration some weeks before. Some of the protesters and the security director were on a first name basis—"Chet" and "Sam."

Protests had been allowed. Thus on April 28, 1979, the day before these appellants were arrested, permission was given by DOE through the Secretary of the Department of Energy for a demonstration to be conducted at the plant site. Approximately ten acres inside the boundary of the plant were roped off to permit demonstrators a forum in which to display their opposition to the continued existence of the plant. No such authorization was in effect for April 29, 1979.

■ As a separate matter, and something of an aside, it should be observed that the regulation applies to entry and the introduction of weapons and explosives on government property. The regulation

*when promulgated* was within the express exception from the APA contained in 5 U.S.C. § 553(a)(2) as involving a matter relating to "public property." It was an exercise of the government's proprietary function—the protection of public property. Senate Report 752, 79th Congress, 1st Session (1945), at 199, states that the exception is to confer "complete discretion on the agencies what, if any, public rule making procedures they will adopt in a given situation." The regulation with all its provisions as to posting and publication of notice of designation thus came within the exception and was effective thereafter as to substance and procedure. As to this exception see *City of Santa Clara, Cal. v. Andrus*, 572 F.2d 660 (9th Cir. 1978), and *National Wildlife Federation v. Snow*, 561 F.2d 227 (D.C. Cir.1976). For contract cases, see *Rainbow Valley Citrus Corp. v. Federal Crop Ins. Corp.*, 506 F.2d 467 (9th Cir. 1974), and *Langevin v. Chenango Court, Inc.*, 447 F.2d 296 (2d Cir. 1971). In 1977 the agency was merged into the DOE and a provision as to procedures was added (42 U.S.C. § 7191) which stated that the exception in the APA referred to above would "not be available." This was not effective until October of 1977, and so this change would not seem to be of significance as to the 1963 regulation generally, and not as to the *designation notices published* and effective as to "Rocky Flats" in 1965. The designation element of the problem thus drops out if it ever was a significant factor, and it does not appear that it was. About all that is left is that the new yellow signs were moved to the outer boundaries to replace or to add to the old ones. The actual notice consequences have been discussed above, and the view expressed that this would not require another hearing.

■ The agency here seems to have concluded that the job was done with adoption of part 860 and we agree. The entire rule making was thus in part 860, it was sufficient in itself, and applicable to Rocky Flats. Subsequent acts were ministerial to carry out the detailed regulation.

Some defendants raise another and separate issue. Defendants who were arrested at the west access road and on the railroad tracks (thus those not in Trial Groups, A, C, and D) urge that since they were arrested at a place where the government did not have the fee but only an easement that trespass cannot be charged.

The statute does not mention trespass as such, but is directed to preventing entry. Thus it gives authority to issue regulations "relating" to entry upon or the introduction of explosives into or upon any facility. The regulations are "for the protection and security of facilities" and unauthorized entry is prohibited. The statute is to control the movement of persons and objects in and out of facilities—the control of access. It is not a matter of trespassing in the traditional sense.

We see no reason why the statute and regulations were not applicable to accomplish the recited purposes whether the access was over an easement or a fee. The intention to have this control was further evidenced by the broad language in the condemnation.

We must hold that the nature of the interest held by the United States in no way limited the application of the statute under which these actions were brought.

For the reasons set forth above and those stated in *United States v. Seward*, the judgments are affirmed.

McKAY, Circuit Judge, will file a dissenting opinion concurred in by LOGAN and SEYMOUR, Circuit Judges.

McKAY, Circuit Judge, dissenting:

Claiming the most arbitrary and unreviewable authority currently approved under federal law, the Department of Energy (DOE) declared two roadways and a railroad track over which it holds an easement criminally inaccessible to all citizens except an undefined group of consentees. It then had arrested and charged with criminal violations a large number of citizens who had legally and persistently appeared on this land for more than a year to register their concerns about the dangers of nuclear power activities being carried out in the Rocky Flats plant more than a mile and a half away. The DOE's claim to this broad, unchecked authority was based upon one sentence in the legislative creation of the Atomic Energy Commission (AEC),[1] enacted more than 21 years before the DOE was established.[2] The DOE's sweeping assumption of authority has never been the subject of hearings or debate in Congress or of traditional administrative hearings required by § 553 of the Administrative Procedure Act (APA), 5 U.S.C. § 553 and the congressionally mandated rulemaking procedures for the DOE, 42 U.S.C. § 7191.[3] The majority of this court now ratifies this suppression of debate under principles that alarmingly would permit the same type of

1. "The [Atomic Energy] Commission is authorized to issue regulations relating to the entry upon .. any facility, installation, or real property subject to the jurisdiction, administration, or in the custody of the Commission." 42 U.S.C. § 2278a(a).

2. The Atomic Energy Commission (AEC) was established by the Atomic Energy Act of 1946, as amended in 1954. In 1956, Congress added 42 U.S.C. § 2278a to the Atomic Energy Act of 1954. That provision gave the AEC the power to regulate entry upon "any facility, installation, or real property subject to the jurisdiction, administration, or in the custody of the [Atomic Energy] Commission." Willful violation of any such regulation could result in a fine of up to $1,000. Pursuant to this authorization, the AEC issued implementing regulations in 1963.

10 C.F.R. § 160 (1963) (current version at 10 C.F.R. § 860). In 1974, the AEC was abolished and most of its functions were transferred to the Energy Research and Development Administration (ERDA). 42 U.S.C. § 5814 (1974). In 1977, Congress created the Department of Energy (DOE), 42 U.S.C. § 7131 (1977), and transferred to the DOE various functions of many federal agencies, including the ERDA. *Id.* at § 7151.

3. Because the requirements of APA § 553 were ignored, we are not told why the DOE decided to expand the trespass boundaries so far beyond those which served the plant for many years.

unaccountable action with regard to millions of acres of government-owned land controlled by the DOE, and, in light of the easements involved in this case, untold acres of land that arguably fall within the DOE's "jurisdiction, administration, or . . . custody."[4] 42 U.S.C. § 2278a(a). The implications for the nearly one billion acres of government-owned land[5] cannot be ignored.

These cases arise out of the growing and often strident debate over the wisdom and safety of using nuclear energy in our society. Quite typically, this dispute does not come here under that name or framed precisely in those terms. Such cases usually arrive at the courts in the form of criminal charges for conducting a parade without a permit, obstructing traffic, disturbing the peace, conducting an illegal boycott, assembling unlawfully, trespassing or engaging in similar criminal or quasi-criminal conduct. As in this case, there is rarely any doubt that the defendants have violated whatever official prohibition prosecutors or other officials have elected to invoke in their effort to prohibit, disturb, or alter the form of debate. The proper role of the courts in these cases is not to examine the merits of the debates, but rather to determine whether the place chosen by the defendants to carry on the debates has been unlawfully or unconstitutionally declared inaccessible under the guise of police regulation. Sometimes our constitutional mandate requires us to determine whether the ordinance, regulation, or legislation on its face exceeds the bounds set by the first amendment, but such a constitutional examination is to be avoided if possible.[6] However, when examining threshold questions we constantly

**4.** The DOE has direct control of more than 2,350,000 acres of government-owned property. General Services Administration, *Summary report of real property owned by the United States throughout the world as of September 30, 1978,* at 39, 44 (August 1979). *See* 42 U.S.C. §§ 7152(a), 7156. In addition, the DOE has varying degrees of authority over the vast amount of public land subject to the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331 *et seq.;* the Mineral Lands Leasing Act, 30 U.S.C. §§ 181 *et seq.;* the Mineral Leasing Act for Acquired Lands, 30 U.S.C. §§ 351 *et seq.;* the Geothermal Steam Act of 1970, 30 U.S.C. §§ 1001 *et seq.;* and the Energy Policy and Conservation Act, 42 U.S.C. §§ 6201 *et seq. See* 42 U.S.C. § 7152(b). As of 1977, mineral leases had been awarded on over 86 million acres of public land, and nearly nine million acres of land had been leased under the Outer Continental Shelf Lands Act. *See* United States Department of Commerce, Bureau of Census, *Statistical Abstract of the United States,* at 237, 761 (September 1979).

**5.** In 1978, the United States held over 775 million acres of land in trust for its citizens. *See* General Services Administration, *Summary report of real property owned by the United States throughout the world as of September 30, 1978,* at 7 (August 1979).

**6.** *See NLRB v. Catholic Bishop,* 440 U.S. 490, 500, 99 S.Ct. 1313, 1318, 59 L.Ed.2d 533 (1979). My analysis would make it unnecessary to consider whether these roads and rights-of-way up to a mile and a half from the Rocky Flats facility are more like public streets or parks, *Hague v. C.I.O.,* 307 U.S. 496, 515–16, 59 S.Ct. 954, 963–64, 83 L.Ed. 1423 (1939) ("The privilege of a citizen . . . to use the streets and parks for communication of views on national questions . . . must not, in the guise of regulation, be abridged or denied"), than they are like army posts, *Greer v. Spock,* 424 U.S. 828, 838, 96 S.Ct. 1211, 1217, 47 L.Ed.2d 505 (1976) (noting "the historically unquestioned power of [its] commanding officer summarily to exclude civilians from the area of his command"). At the very least, the area at which these protesters were arrested is arguably a public place; indeed, protesters had gathered there on previous occasions without incident. *See Albany Welfare Rights Organization v. Wyman,* 493 F.2d 1319 (2d Cir. 1974) (holding unconstitutional an absolute ban on leafletting in welfare offices where such leafletting had been permitted previously), *cert. denied,* 419 U.S. 838, 95 S.Ct. 66, 42 L.Ed.2d 64 (1974). The DOE's decision absolutely to prohibit all speech in the area by means of an extremely broad trespassing rule would be very difficult to sustain. The Constitution perceives a difference between absolute prohibition and mere regulation of speech. *See* Stone, *Fora Americana: Speech in Public Places,* 1974 Sup.Ct.Rev. 233, 239–45. The latter has been affirmed only when "significant governmental interests" are shown to be furthered. *Grayned v. City of Rockford,* 408 U.S. 104, 115–16, 92 S.Ct. 2294, 2302–03, 33 L.Ed.2d 222 (1972). The former has withstood constitutional scrutiny only in rare circumstances not present here. *See Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1975).

must be alert to whether the regulations have the effect of impinging upon or threatening first amendment values. If they do, our inquiry must be all the more rigorous.

While the issues before us cause us to focus on threshold questions antecedent to direct first amendment issues, properly perceived they involve the same values. Indeed, if what I believe to be the mandated procedures of the APA and the specific congressionally mandated rulemaking procedures of the DOE had been followed, there is a substantial prospect that parts of this debate would have been transferred from roadways (traditional, but perhaps not preferred, forums for petition for redress of grievances) to a forum that would have fostered a full exchange of information, and would have produced a record from which we could determine whether the DOE's actions conformed to minimum administrative, legislative, and constitutional standards.

## I.

Although numerous other questions have arisen during these trials, the principal and, in my view, the dispositive issue is whether the DOE properly may determine, without a hearing, that any nonpermissive presence on these roadways and rights-of-way will,

from the moment of that determination and actual notice to the defendants, become a criminal act.[7] The corollary to that question is whether, as required by APA § 553, these unelected administrators must submit any proposal that turns previously lawful conduct into criminal conduct to debate and recorded justifications that permit effective judicial scrutiny. I believe there is no doubt that APA § 553 and the rulemaking procedures specifically established for the DOE apply to this case. However, in any event, since we deal with a difficult question in the murky field of administrative lawmaking, interpretation, and administration, I believe that any doubt about the APA's applicability ought to be resolved in favor of requiring the debate and justification procedures of APA § 553. This canon of construction is all the more urgent in the context of this case where the inevitable consequence of the DOE's hasty actions is to turn otherwise innocent behavior into criminal behavior.[8] A further reason to follow this canon of construction in this case is the real, and not fancied, ambient presence of first amendment values.

This extensive prelude is necessary because to date the administrative, prosecutorial, and judicial processes appear to have trivialized the importance of these cases.[9] I do not attribute any improper motivation to

---

Even if this sweeping exclusion of virtually all persons from the protest area can be seen as a mere regulation, it would have to be supported by compelling justifications: "[T]he delicate and difficult task falls upon the courts to weigh the circumstances and to appraise the substantiality of the reasons advanced in support of the regulation of the free enjoyment of" the freedom of speech. *Schneider v. State*, 308 U.S. 147, 161, 60 S.Ct. 146, 150, 84 L.Ed. 155 (1939). In light of the symbolic propriety of taking one's protest to its source, *see Brown v. Louisiana*, 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966), the DOE's burden should be all the heavier. Yet, due to a failure to comply with APA § 553, we have been provided with absolutely no record of the DOE's reasons for its action. The balancing required by the Constitution in this case has thus been sabotaged from the outset.

7. I do not dissent from the disposition of those issues other than the issue treated here. I do

believe, however, that they are preempted by this overriding issue.

8. A proper respect for the principles of lenity and caution in finding otherwise protected conduct criminal suggests, at the very least, that where doubt exists, the congressionally mandated hearing procedures of APA § 553 should be followed. *Cf. Rewis v. United States*, 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971). Surely, at least some doubt exists in this case.

9. The majority's attempt to characterize this case as one involving the mere ministerial function of moving signs or fence posts is clearly betrayed by the fact that these "ministerial" acts expanded criminal jurisdiction of the DOE over thousands of additional acres and turned previously lawful conduct into a crime. Of course, if one chooses to characterize these matters as the mere moving of fence posts or

the courts who, given the magnitude of the arrests and charges, processed these cases with commendable efficiency and care for procedural regularity and fairness. Nor am I unsympathetic to the plight of administrators who are confronted with the amazing persistence and irritating presence of persons who represent a threat to the continued legislative and public support of the mission in which their agency is engaged. While we may wish that unpleasant disputes, as well as the underlying fears and concerns, will just go away, they will not. Our duty on review is to insure that the processes surrounding the debate stay within legislative and constitutional bounds.

## II.

The Rocky Flats nuclear generating plant is located near Denver, Colorado. It was constructed by the AEC in 1952 and enclosed by a secure chain link fence. At that time the AEC was not given power to exclude persons on the grounds of trespass. In 1956 Congress amended the Act to authorize the AEC "to issue regulations relating to the entry upon ... any facility, installation, or real property" under its jurisdiction. 42 U.S.C. § 2278a(a). The AEC first promulgated a regulation pursuant to this authority in 1963, which prohibited "[u]nauthorized entry upon any facility, installation or real property *subject to this part.*" 10 C.F.R. § 860.3 (emphasis added).[10] No attempt was made in that regulation to designate what lands, if any, would be included. It expressly left to future determination the designation of facilities, installations or real property that should be made subject to the prohibition. In 1965 the AEC designated the Rocky Flats site as subject to trespass restrictions. 30 Fed. Reg. 13,289 (1965). This designation included only that area enclosed in the original chain link fence and security system. In 1975 an AEC successor (ERDA) acquired a substantial body of surrounding property, apparently to prevent encroachment of land developers. All of these steps were taken when the agency had a very limited scope and function. In 1977, the DOE was created and given vastly expanded functions, including the functions formerly belonging to the AEC. This was done without consideration of or reference to the prior grant of security functions to the AEC—these functions were anonymously included in a blanket transfer.[11]

Sixteen days before the arrest of these defendants, the DOE greatly expanded the

as simple questions of whether someone has set foot in a forbidden place, these cases are trivial. Approached in the same frame of mind, great cases in our civil rights revolution were equally trivial. Lest there be a temptation to suggest that the debate before us is somehow unimportant, the issues must be examined against the backdrop of Three Mile Island, the Love Canal, the Jack Rabbit Flats nuclear fallout cases, the asbestos cases and myriad other such cases that are wending their way through the courts as demands for reparation for injuries to innocent and unsuspecting citizens. Our cases become urgently more important because they are attempts through debate or, if preferred, protests, to persuade those who wield governmental power to change policy in advance of perceived destruction. It may well be that the factual claims are doubtful. However, there is no doubt that the issues of the debate are of immense and dramatic significance both from the perspective of those who advocate the use of nuclear facilities as a means of combating our fuel crises and those who claim that such a course is worse that the evil sought to be circumvented.

**10.** There is no evidence that suggests this generalized regulation was not promulgated pursuant to APA § 553.

**11.** *See* note 2, *supra*. The majority states as an "aside" that "[t]he regulation *when promulgated* was within the express exception from the APA contained in 5 U.S.C. § 553(a)(2) as involving a matter relating to public property." *U. S. v. Thompson*, — F.2d —, — (10th Cir. 1982). The majority thus implies that the expanded trespass designation would still be within this exception. However, Congress, by statute, expressly stated that this exception "shall not be available" to the DOE. 42 U.S.C. § 7191(b)(3). There is no reason to believe this language means anything other than what it says; hence it appears that the DOE could not rely on this exception, regardless of when the designation was first published.

designated trespass area to include the 1975 ERDA acquisitions and the railroad easement over private lands adjacent to the plant. 44 Fed.Reg. 22,145 (1979). The majority held that the establishment of the federal crime of trespass at the site where appellants were arrested occurred in 1965—some ten years before the federal government even acquired the land where the violations occurred. The majority reasons that the adoption of the anti-trespassing regulation in 1963 and the designation of the facility at Rocky Flats in 1965 as a facility subject to this regulation satisfy the notice and comment requirements of the APA. Precisely because the DOE did not follow the hearing requirements of APA § 553 in extending the trespass designation, we do not know whether any purpose other than the stifling of debate was served by this extension of criminal jurisdiction. Since the arrest sites are more than a mile from the security fence, much further away than some private lands not subject to these regulations, and because there is no evidence that the defendants' protests seriously interfered with plant functions or ingress and egress, the implications of interference with and stifling of free speech are compelling.

If a pressing security need existed for the extension of the boundaries (a proposition certainly not supported by the record), Congress provided emergency procedures for such a contingency. 42 U.S.C. § 7191(e); 5 U.S.C. § 553(b)(B).[12] No attempt was made to invoke them here, evidently because this case involves not security of the facility, but security of the policies that were perceived as threatened by controversy and notoriety.

## III.

Section 553 of the APA, made applicable to the DOE by 42 U.S.C. § 7191(a), requires that an agency promulgating a rule provide interested persons with notice of the rulemaking and an opportunity for comment. 5 U.S.C. §§ 553(b), (c). The objective of these provisions is not merely to give notice, but also to insure opportunity for debate and mature consideration of the proposal. In addition, the required publication of a rule promulgated in accordance with this procedure must be made at least 30 days before it becomes effective. 5 U.S.C. § 553(d); 42 U.S.C. § 7191(b). The only publication of the enlarged designated trespass area was made 16 days prior to the arrests. Furthermore, the congressionally mandated rulemaking procedures for the DOE, which are stricter than the APA in some respects, specifically require that "[s]uch publication shall be accompanied by a statement of the research, analysis, and other available information in support of, the need for, and the probable effect of, any such proposed rule, regulation, or order." 42 U.S.C. § 7191(b)(1). It is clear that none of the trespass "designations" of the Rocky Flats plant site conformed to these requirements. Consequently, because these rules are subject to the APA, they are invalid so that, in my opinion, the defendants were not trespassing when arrested. See NLRB v. Wyman-Gordon Co., 394 U.S. 759, 763–66, 89 S.Ct. 1426, 1428–29, 22 L.Ed.2d 709 (1969) (plurality opinion); Joseph v. United States Civil Service Commission, 554 F.2d 1140, 1153–54 (D.C.Cir.1977). The weakness of the majority's conclusion that the DOE's actions do not constitute rulemaking is underscored by the fact that the majority relies heavily on a line of reasoning noticeably devoid of citation to authority.

All legislative or substantive rules issued pursuant to a delegation of congressional

---

12. The requirements of APA § 553 do not apply "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B). The statute also provides that the 30-day publication requirement is waived "for good cause found [by the agency] and published with the rule." 5 U.S.C. § 553(d)(3). The Rocky Flats designations published in the *Federal Register* do not contain any explanation for the failure to comply with APA § 553, and the DOE has not in its brief urged any justifications sufficient to excuse compliance.

authority—in this case, 42 U.S.C. § 2278a—and having the force of law are subject to the requirements of APA § 553 unless otherwise exempt. The APA defines a "rule" as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy . . . ." 5 U.S.C. § 551(4). The majority characterizes the agency designations as mere ministerial acts, and not rules. However, the clear meaning of the word "ministerial" and the express language of § 551(4) belie that characterization. A ministerial act, by definition, "is one in respect to which nothing is left to discretion. It is a simple, definite duty, arising, under conditions admitted or proved to exist, and imposed by law." *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 498–99, 18 L.Ed. 437 (1867). *See Statter v. United States*, 66 F.2d 819, 821 (9th Cir. 1933). It cannot seriously be argued that a decision to make thousands of acres of government-owned property inaccessible to the public is a ministerial act involving no exercise of discretion. Clearly, such an act is "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4).

If, as the majority concludes, the regulations appearing in 10 C.F.R. § 860 are the only "rules" promulgated under 42 U.S.C. § 2278a for which § 553 notice and comment procedures are required, an agency can successfully circumvent the purpose of § 553. Meaningful comment cannot be expected until the agency specifically applies the terms of the enabling statute. No one could have known where and how the delegated power would be exercised or if such exercise would be reasonable until specific areas were designated. An agency should not be permitted to exempt itself from the congressionally mandated requirements of the APA through its own regulations.

The DOE's actions in this case are not appropriately characterized as falling within any of the exceptions expressly provided for in the APA. APA § 553 is expressly made inapplicable to "interpretative rules [and] general statements of policy." [13] 5 U.S.C. § 553(b)(A). An interpretative rule or policy statement is a declaration issued without lawmaking authority or without any intent to exercise that authority. *See generally Joseph v. United States Civil Service Commission*, 554 F.2d at 1153–54 nn.24, 26; 2 K. Davis, *Administrative Law Treatise*, §§ 7:5–7:19 (2d ed. 1979). An interpretative rule is not finally determinative of the issues it addresses; rather it announces the course the agency plans to take in future rulemakings or adjudications. *Pacific Gas & Electric Co. v. FPC*, 506 F.2d 33, 37 nn.14, 38, 41 (D.C.Cir.1974). An interpretative rule is not one "which the public is required to obey," *Airport Commission v. CAB*, 300 F.2d 185, 188 (4th Cir. 1962), "does not impose any rights and obligations," *Texaco, Inc. v. FPC*, 412 F.2d 740, 744 (3rd Cir. 1969), and "has no independent binding effect." *Eastern Kentucky Welfare Rights Organization v. Simon*, 506 F.2d 1278, 1290 (D.C.Cir.1974), *vacated for lack of standing*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). Even a policy which purports merely to suggest how agency discretion should be exercised becomes a legislative rule when it effectively circumscribes

**13.** The terms "substantive rule" and "legislative rule," used interchangeably by many authorities, refer to any rules which are subject to APA § 553. "Interpretative rules" and "general policy statements," although similar, are distinguishable for some purposes. The Attorney General's Manual on the Administrative Procedure Act (1947) gives these definitions:

*Substantive rules*—rules, other than organizational or procedural . . . issued by an agency pursuant to statutory authority and which

implement the statute . . . . Such rules have the force and effect of law.

*Interpretative rules*—rules or statements issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers.

*General statements of policy*—statements issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power. *Id.* at 30 n.3.

any choice and mandates a certain result. *See Guardian Federal Savings & Loan Association v. FSLIC*, 589 F.2d 658, 666–68 (D.C.Cir.1978). *Cf. Noel v. Chapman*, 508 F.2d 1023, 1030 (2d Cir.), *cert. denied*, 423 U.S. 824, 96 S.Ct. 37, 46 L.Ed.2d 40 (1975). In short, a rule which changes law or makes law cannot be merely interpretative. *See Detroit Edison Co. v. EPA*, 496 F.2d 244, 248–49 (6th Cir. 1974); *Shell Oil Co. v. FPC*, 491 F.2d 82, 87–88 (5th Cir. 1974); *National Association of Insurance Agents, Inc. v. Board of Governors*, 489 F.2d 1268, 1270 (D.C.Cir.1974).

Obviously, then, the DOE's conduct in this case is not interpretative. The conduct is also not a mere statement of policy. Any decision that affects thousands of acres of land and immediately criminalizes otherwise legitimate behavior cannot, under any stretch of the imagination, be labeled a mere "statement of policy."

The distinctions drawn by these cases dictate that the designations that changed what would have been lawful entry on federal land into criminal trespass are legislative in character. In issuing the designations, the DOE and its predecessors clearly intended to bind the courts and to determine the rights and liabilities of those entering the Rocky Flats area. The designations not only impose obligations on the defendants, they also authorize criminal sanctions for failure to obey. If turning previously lawful presence on public lands into criminal trespass is not substantive rulemaking, then nothing is. If the APA is to have any meaning, it must be strictly applied when criminal consequences are involved. *See generally United States v. Gavrilovic*, 551 F.2d 1099, 1103, 1106 (8th Cir. 1977).

Although the parallels apparently escape the majority, there is a close comparison between this case and *Joseph v. United States Civil Service Commission*, 554 F.2d 1140 (D.C.Cir.1977). The Civil Service Commission was empowered under 5 U.S.C. § 7327(b) to create exceptions to the Hatch

Act. Pursuant to this authority, the Commission issued a regulation in 1970 designating a list of municipalities wherein a federal employee

> may take an active part in political management and political campaigns in connection with partisan elections for local offices . . . subject to the following. limitations:
>
> (1) Participation in politics shall be as an independent candidate or on behalf of, or in opposition to, an independent candidate.

5 C.F.R. § 733.124(c). Four years later, the District of Columbia was added to the exempt municipalities list by a notice of amendment published in the *Federal Register*. 39 Fed.Reg. 18,761 (1974). The District of Columbia Circuit Court of Appeals held that the addition must be classified as a legislative, rather than interpretative, rule and that it was therefore invalid because it was not issued in conformity with APA § 553:

> When it added the District to its exemption regulation the Commission clearly intended to exercise [its delegated] authority and promulgate a rule with the full force of law. Whether or not the District of Columbia is to be exempt from Hatch Act prohibitions is not a matter requiring either clarification of statutory language or a public indication of how the Commission will exercise a discretionary power.

554 F.2d at 1153.

Although the majority attempts unconvincingly to distinguish *Joseph* factually, the reasoning of that case is directly applicable in this case. The Rocky Flats designations represent attempts to exercise and implement the authority delegated by 42 U.S.C. § 2278a(a). Until the responsible agency designated particular tracts of land as subject to restrictions, 42 U.S.C. § 2278a and 10 C.F.R. § 860 were hollow shells, devoid of substance. Specific designations through proper administrative procedures were essential to make the provisions effec-

tive and enforceable with respect to each parcel of land included in the no trespassing area. Accordingly, these designations are substantive rules subject to the notice and comment procedures of APA § 553. The 1979 designation expanding the boundaries substantively affected the enforcement scheme in the same manner that the inclusion of the District of Columbia affected the Civil Service scheme in *Joseph. See also Law Motor Freight, Inc. v. CAB,* 364 F.2d 139, 142–43 (1st Cir. 1966), *cert. denied,* 387 U.S. 905, 87 S.Ct. 1683, 18 L.Ed.2d 622 (1967); *Hotch v. United States,* 212 F.2d 280 (9th Cir. 1954). Contrary to the majority, I cannot conclude that the mere designation of Rocky Flats at one time effectively encompasses any area the government may later annex to, or designate as, "Rocky Flats" for the purpose of restricting entrance to government lands. Such rules cannot be valid unless promulgated in conformity with APA § 553. The majority states that the property description contained in the 1965 designation was mere "surplusage." If so, then the majority effectively empowers federal agencies to create whatever rules they wish pertaining to federal facilities, which will apply to any land within whatever the agency chooses to call the boundaries on a particular day. This, of course, prevents the notice, discussion, and consideration process mandated by the APA.[14]

### IV.

The government argues that the defendants' actual notice of the entry restrictions at Rocky Flats[15] bars a defense based on the "technical" requirements of the APA. This argument, however, is inappropriate under the circumstances of this case.

The APA speaks to two points along the administrative continuum at which interested parties must be notified. APA § 553(b) requires that "general notice of *proposed* rulemaking . . . be published in the Federal Register, unless persons subject thereto . . . have actual notice thereof." (Emphasis added). In response to such a notice, had it been given, the defendants could have participated in what would have been the rulemaking proceedings on the DOE's proposal to limit the physical arena for debate over Rocky Flats. APA § 553(d), on the other hand, deals with publication of final rules which have been promulgated pursuant to agency rulemaking procedures. Section 553(d) requires that a substantive rule be published or served "not less than 30 days before its effective date." Section 553(d) does not contain an actual notice exception. However, the public information provision of the Freedom of Information Act, 5 U.S.C. § 552(a), which requires that substantive rules be published in the *Federal Register,* does contain such an exception.

Affected parties, then, are entitled to be notified, either through the *Federal Register* or actually, at two points before an agency's *notion* can become a *rule* that will be binding. It is crucial to bear in mind that the rulemaking process precedes and is different from a substantive rule. Notice of proposed rulemaking will not make a final rule that was promulgated without proper notice effective, and notice that a final rule has been promulgated will not cure lack of notice of contemplated rulemaking. The two notices serve different purposes and are not interchangeable.

Thus, defendants' actual notice that Rocky Flats' restricted area had been expanded cannot be construed as satisfying the § 553(b) notice of *proposed* rulemaking requirements. At the time of this actual notice, the time for comment and discussion

---

14. The majority's reliance on the public property exception to the APA's notice and comment requirements is completely unfounded. *See* note 11, *supra.*

15. The testimony taken at the motions hearing shows that the trespassing prohibition was posted clearly and conspicuously, in conformity with 10 C.F.R. § 860.6, at intervals along the boundary of the area restricted by the April 13 notice. In addition, the demonstrators were warned before the actual trespasses and arrests that they would be arrested and prosecuted if they persisted.

of the proposed designation was long past. In fact, there never was such a time since no rulemaking procedures were ever proposed or conducted for these designations. Therefore, affected persons could not have been given notice of them. *Cf. Texaco, Inc. v. Federal Energy Administration*, 531 F.2d 1071, 1081–82 (TECA), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976). Notice of a final rule, by publication or actual notice, does not cure improper notice and comment procedures. *See National Tour Brokers Association v. United States*, 591 F.2d 896, 901–02 (D.C.Cir.1978); *City of New York v. Diamond*, 379 F.Supp. 503, 515–18 (S.D.N.Y.1974). "Section 4(b) of the Administrative Procedure Act [5 U.S.C. § 553(b)] requires notice *before* rulemaking, not after." *Wagner Electric Corp. v. Volpe*, 466 F.2d 1013, 1020 (3rd Cir. 1972). " 'The required publication . . . of a substantive rule' [§ 553(d)] does not relate back or refer to the publication of '[g]eneral notice of proposed rulemaking' [§ 553(b)]." Attorney General's Manual on the Administrative Procedure Act 36 (1947). *See also United States v. Gavrilovic*, 551 F.2d 1099, 1104 n.9 (8th Cir. 1977).

Even if the actual notice provision of the Freedom of Information Act, 5 U.S.C.

§ 552(a), excused publication of a final rule in the *Federal Register*,[16] it does not address the § 553(b) requirement of notice of proposed rulemaking.

In short, the statutes regulating the publication of adopted rules do not nullify the requirement of proper promulgation contained in APA §§ 553(b), (c):

> On its face, section 552 requires only the publication of *existing* rules . . . . The section requires agencies to make "*available*" . . . the substantive rules and general policies which *have been "adopted"* or "*formulated and adopted.*" This interpretation is bolstered by the existence of an entirely separate section, § 553, headed "rulemaking," and by the legislative history of the APA itself.

*City of Santa Clara v. Andrus*, 572 F.2d 660, 673 (9th Cir.), *cert. denied*, 439 U.S. 859, 99 S.Ct. 176, 58 L.Ed.2d 167 (1978) (emphasis added). An agency should not be allowed wholly to escape the rigors of rulemaking prescribed by APA § 553 by informing detrimentally affected persons of the terms of an illegally issued rule moments before a violation.[17]

## V.

Although experience may justify some cynicism about the utility of administrative

---

16. The interrelationship of the APA § 553(d) delayed effectiveness requirement and the actual notice exception to § 552(a) has not been effectively delineated. The Attorney General has explained that "[t]he purpose of the time lag required by [§ 553(d)] is to 'afford persons affected a reasonable time to prepare for the effective date of a rule or rules or to take any other action which the issuance of rules may prompt.' " Attorney General's Manual on the *Administrative Procedure Act* 36 (1947) (quoting S.Rep.No.752, 79th Cong., 1st Sess. 15 (1945); H.R.Rep.No.1980, 79th Cong., 2d Sess. 25 (1945)). This purpose, in contrast to a purpose of merely insuring that affected parties learn of the rule's promulgation before its effective date, is not realized if rules are immediately effective against persons with actual notice. There is authority suggesting that actual notice does not negate the 30-day delay required for legislative rules. *See Hotch v. United States*, 212 F.2d 280, 283–84 (9th Cir. 1954). In *Lewis-Mota v. Secretary of Labor*, 469 F.2d 478 (2d Cir. 1972), the court insisted that finding the directive in question to be a legislative rule that should have been issued in accord-

ance with § 553 made it unnecessary to consider whether the appellants had actual notice sufficient to excuse failure to publish under § 552. 469 F.2d at 481. The directive was declared invalid until 30 days after it was actually published in the *Federal Register*. *Id.* at 482.

17. In addition to the procedures of the APA, the DOE must comply with the administrative procedure requirements established by Congress specifically for the DOE in the Department of Energy Organization Act, 42 U.S.C. § 7191. The DOE is therein required to allow at least 30 days following publication of a proposed rule in the *Federal Register* before the rule may be promulgated. 42 U.S.C. § 7191(b)(1). This duty is imposed on the DOE "in addition to" the requirements of the APA. *Id.* Accordingly, even if the actual notice exception of APA § 553(b) excused the agency from compliance with that section's notice requirement, the agency still has the obligation to provide 30 days notice of proposed rulemaking under 42 U.S.C. § 7191(b)(1). That section contains no actual notice exception.

hearings, the law does not authorize us to surrender to that cynicism as today's opinion does. The underlying thesis of the APA, however contrary to bureaucratic nature, is that an administrative agency will implement sounder policy after hearings have revealed any objections to proposed agency plans and the agency has carefully weighed the evidence and considered the objections. Even if this process fails to impress a determined agency, the hearing will at least provide a record that will permit informed judicial review. The procedures we ratify today require us to act without satisfactory evidence to determine whether any significant purpose other than the stifling of debate was served or intended to be served by the extension of boundaries marked for trespass.

Naturally, no agency wishes to face the protests of citizens who object to its actions. It is often embarrassing and inconvenient. It may even create a public outcry resulting in a cancellation of agency missions. It is the very purpose of the APA notice and comment procedures to insure that, when Congress surrenders its deliberative duties to one of many bureaucracies, detailed actions not tested by congressional debate will be tested by public debate under administrative auspices. That was not done here and no notice can cure the deficiency. Our irritation with demonstrative (although essentially passive) debate techniques should not lead us to dispense with debate or to ratify confrontive responses by public servants. The actions in this case suggest the danger inherent in bypassing established administrative processes.

Although I agree with most of the discussion of most of the issues in these cases, I would reverse the convictions of every defendant arrested and charged under improperly promulgated DOE rules.

McKAY, Circuit Judge, with whom LOGAN and SEYMOUR Circuit Judges, concur in the dissent.