687 F.2d 1305
 UNITED STATES of America, Plaintiff-Appellee,
v.
Robert HUEFTLE, Christopher W. Moore, Robert Cooper, Joan
Grable, Doreen Richmond, Jack Burrows, Mark Bassett, Cameron
M. Ostrow, Christine A. Smith, Bill E. Preston, Maryann
Zavez, Alice McClelland, Judith Kay Wilkinson, and John
Irwin, Defendants-Appellants.
 Nos. 79-1822 to 79-1835.
 United States Court of Appeals,
Tenth Circuit.
 June 17, 1982.
Rehearing Denied Aug. 11, 1982.
 
 John S. Evangelisti of LaFond & Evangelisti, Denver, Colo. (Jonathan L. Olom, Denver, Colo., Tim Correll, Denver, Colo., and Cathlin Donnell of Kelly, Haglund, Garnsey, Kahn & Donnell, Denver, Colo., on the brief), for defendants-appellants.
 Nancy E. Rice, Asst. U. S. Atty., for the District of Colorado, Denver, Colo. (Joseph F. Dolan, U. S. Atty., Denver, Colo., with her on the brief), for plaintiff-appellee.
 Before SETH, Chief Judge, and HOLLOWAY, McWILLIAMS, BARRETT, McKAY, LOGAN and SEYMOUR, Circuit Judges.
 SETH, Chief Judge.
 
 
 1
 These are part of a series of eighty-six appeals from convictions for violating 42 U.S.C. §§ 2278a(a) and (b) and 10 C.F.R. §§ 860.3, 860.5(a), and 860.6.
 
 
 2
 The appellants in Trial Group J were arrested at the west access road. The following facts are relevant to this group.
 
 
 3
 The west access road is a one and a half-mile road leading from Highway 93 to the west guard gate at Rocky Flats. See Appendix A attached. Testimony indicates that an easement to this road was acquired in 1952 when the plant was constructed. The west access road is also used by private persons having water rights to certain ditches, mineral rights, and clay pit operations within the buffer zone. The government's 1975 land acquisition included all but the westernmost half-mile or so of this road, which retained its easement status. See 44 Fed.Reg. 22146 (April 13, 1979). A white line approximately eight to twelve inches wide was painted across the west access road at or inside the Rocky Flats boundary as printed in the April 13 notice in the Federal Register. No trespassing signs were attached to the outside of the boundary fence and to the temporary barricades and ropes stretched across the roadway.
 
 
 4
 Around noon on April 29 several hundred people began arriving at the west entrance to Rocky Flats at the junction of Colorado State Highway 93 and the west access road, assembling on the west side of Highway 93. The first group of demonstrators crossed the highway and was stopped and quieted by a group leader, Chris Moore. At this point Sam Thomas, manager of plant protection for Rockwell, announced to the group through an electronic bullhorn that it was about to trespass on federal property and would be subject to arrest under the provisions of the Atomic Energy Act. Deputy Marshal Gallagher made a second announcement, also with the bullhorn, that the group was trespassing and would be arrested if it did not leave. Although there had been one or more helicopters in the area, none was present during the time of these announcements.
 
 
 5
 The demonstrators crossed over the white line and proceeded through or around several makeshift barricades toward a police line composed of Rockwell security force personnel and other deputy marshals. The police line was positioned across the road some distance east of the white line to avoid congestion and possible danger to persons congregating on or near the state highway. The demonstrators then sat down in small groups on the road and began chanting. The marshals were directed to warn individually each person prior to making an arrest. Therefore, according to testimony, each demonstrator was told three times to leave prior to being arrested: once by Sam Thomas; once by Deputy Marshal Gallagher; and once by the arresting deputy marshal.
 
 
 6
 If the person did not leave after the last warning, he or she was arrested and handed over to Rockwell security force officers. Each arrestee was photographed with the security person taking physical custody along with a sign and a number. Each arrested protester was then escorted, walking or being carried, to the buses. Approximately 140 persons were arrested at this location.
 
 
 7
 Testimony by Roger Brown, a surveyor with the United States Army Corps of Engineers, indicated that the arrest sites pointed out to him by Sam Brown were 70 to 120 feet east of the west access road boundary line.
 
 
 8
 There were numerous observers, media people and others present, some of whom crossed the white line onto federal property. None of those persons not arrested, however, sat down or physically obstructed the roadway. The forty to sixty "nonarrestees" left the area when so instructed by marshals or Rocky Flats personnel.
 
 
 9
 For a discussion of the post-arrest and pretrial proceedings, see United States v. Seward, 687 F.2d 1270, (10th Cir.), filed this date.
 
 
 10
 Before the jury selection, defense counsel Cathlin Donnell informed Judge Arraj that she and one of her cocounsel, while having coffee in the federal cafeteria, had observed some jurors openly discussing the case. Donnell also had noticed little blue cards printed with the phrase "They're Guilty, Nuke'M," one of which she presented to Judge Arraj. In pretrial matters conducted the same afternoon before Judge Winner, he marked the card as court's Exhibit A, and directed that the card be made part of the record.
 
 
 11
 The trial court was concerned about the effect of the card and other literature on the jury, but was not inclined to move the trials to another location at that point. He left it up to counsel and the individual defendants whether they wished the judge to bring up the matter with the jury. The general consensus of the three attorneys and the pro se defendants was a preference that the jury not be questioned about the card.
 
 
 12
 Midway through the jury selection process conducted before the Honorable Alfred A. Arraj, Donnell moved for a change of venue or continuance on the grounds that it was impossible in the second week of these trials, with over 100 convictions having already been entered, to obtain an impartial jury. She renewed this motion after the jury had been selected.
 
 
 13
 After having sworn the jurors, Judge Winner carefully emphasized that they were not to read, watch, or listen to anything about the case or the subject matter. This admonition to the jury was repeated at appropriate intervals preceding the usual recesses.
 
 
 14
 After the prosecution had rested, defense counsel moved for judgments of acquittal for failure to prove a sufficient property interest in the west access road easement and for failure to prove lack of authorization. All motions were denied.
 
 
 15
 Most of the defendants who testified stated that they did not see any of the yellow no trespassing signs or barricades. Several said they did not hear the announcement made by Sam Thomas. Some indicated they neither intended to break the law nor to be arrested. All claimed their intent was simply to make a statement.
 
 
 16
 After the defense had rested, defense counsel moved for judgment of acquittal on the ground that no proof had been offered to establish publication of the boundaries of Rocky Flats in the Federal Register. Various instructions were tendered and refused.
 
 
 17
 After the jury had retired to begin deliberations, the following note was sent to Judge Winner:
 
 
 18
 "Your Honor, when we opened and emptied the trial exhibits envelope, we discovered the enclosed card. Enclosed card is Court's Exhibit A. Those of us who have seen the card have voted, aware that we are still under oath, that we can ignore this just as we have ignored any media information that we had seen prior to the trial. Only three of us have not seen the enclosed card. We await your decision. Judy Kurtz, Foreperson."
 
 
 19
 Judge Winner stated for the record that the inclusion of this exhibit was totally accidental. Three defendants, Christine Smith, John Irwin, and Maryann Zavez, moved for a mistrial.
 
 
 20
 The jury was brought into the courtroom and Judge Winner carefully questioned them on whether they could ignore the court's exhibit. He further explained that it was included in the exhibit packet inadvertently. After the jury had again retired, the motions for mistrial were denied.
 
 
 21
 The issues raised by Trial Group J are as follows:
 
 
 22
 1. The trial judge erred in refusing to allow appellants to present to the jury the defense of "necessity" or "choice of evils."
 
 
 23
 2. The convictions are invalid because the designation of boundaries in the Federal Register on April 13, 1979 fails to comply with the provisions of 5 U.S.C. §§ 551, et seq., 42 U.S.C. §§ 7191, et seq., and 10 C.F.R. §§ 860.1, et seq., as well as internal DOE standards published at 44 Fed.Reg. 1032 (January 3, 1979).
 
 
 24
 3. The trial court erred in instructing the jury that proof of the government's ownership of an easement over the land in question is sufficient to permit a conviction for trespass, and in denying defendants' motion for judgment of acquittal based on the government's failure to prove a sufficient proprietary interest in the land in question to sustain a conviction for trespass.
 
 
 25
 4. The trial court erred in limiting defendants to three peremptory challenges, and denying defendants' challenges for cause.
 
 
 26
 5. The court erred in denying defendants' motion for a continuance or change of venue based on the predisposition and prejudgment of the case by the jury panel.
 
 
 27
 6. The trial court erred in failing to declare a mistrial upon motion of defendants when the jury was given court's Exhibit A, a card that read, "They're Guilty, Nuke'M."
 
 
 28
 The first issue is controlled by this court's decision in United States v. Seward. The second and third issues are governed by our decision in United States v. Thompson, 687 F.2d 1279 (10th Cir.), filed this date.
 
 
 29
 Group J, consisting of fifteen defendants, was allowed only three peremptory challenges altogether. Fed.R.Crim.P. 24(b) provides in the appropriate part,
 
 
 30
 "If the offense charged is punishable by imprisonment for not more than one year or by fine or both, each side is entitled to 3 peremptory challenges. If there is more than one defendant, the court may allow the defendants additional peremptory challenges and permit them to be exercised separately or jointly."
 
 
 31
 Whether to grant additional challenges is within the judge's discretion. United States v. Tucker, 526 F.2d 279, 283 (5th Cir.), cert. denied, 425 U.S. 958, 96 S.Ct. 1738, 48 L.Ed.2d 203 (1976).
 
 
 32
 Defendants first argue that impairment of the right of peremptory challenges is reversible error, relying on Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). Although this case discusses the importance of the peremptory challenges in our jury system, the issue was whether the prosecutor could use the challenges to systematically exclude all blacks from the jury. Also, the "impairment" of the right to peremptory challenges refers to denial of the mandatory challenges, not whether more should be given. See United States v. Rucker, 557 F.2d 1046 (4th Cir. 1977).
 
 
 33
 Defendants next argue that failure to grant challenges in the following circumstances was error: fifteen defendants had to share three challenges, with considerable disagreement over how to exercise them; the judge failed to sustain challenges for cause to two jurors, Martin and McConnell, who acknowledged they were biased; because of extensive pretrial publicity, sixteen out of a panel of eighteen knew of the case and one-third had an opinion on the merits.
 
 
 34
 Multiple defendants have no right to more peremptory challenges than given them by the rule, even when they disagree on how to exercise them, as long as they are given trial by an impartial jury. Stilson v. United States, 250 U.S. 583, 40 S.Ct. 28, 63 L.Ed. 1154 (1919) (two defendants); United States v. Williams, 463 F.2d 393 (10th Cir. 1972) (two defendants); United States v. Stidham, 459 F.2d 297 (10th Cir.), cert. denied, 409 U.S. 868, 93 S.Ct. 168, 34 L.Ed.2d 118 (1972) (two defendants). Cf. United States v. Hooper, 575 F.2d 496, 498 (5th Cir.), cert. denied, 439 U.S. 895, 99 S.Ct. 256, 58 L.Ed.2d 242 (1978) (dicta indicating it might be an abuse of discretion if there was a conflict of interest between codefendants). When the trial judge examines jurors and concludes they are not prejudiced, but defendants disagree, this does not entitle them to additional peremptory challenges even though they may use what challenges they have on those jurors. United States v. Palumbo, 401 F.2d 270, 275 (2d Cir. 1968), cert. denied, 394 U.S. 947, 89 S.Ct. 1281, 22 L.Ed.2d 480 (1969).
 
 
 35
 Even though jurors read about or knew of the protesters' case, this is not sufficient grounds for excusing a juror as partial. United States v. Lamb, 575 F.2d 1310, 1315 (10th Cir.), cert. denied, 439 U.S. 854, 58 L.Ed.2d 160 (1978). The court in United States v. Haldeman, 559 F.2d 31, 79 (D.C.Cir.1976), cert. denied, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977), found no error in the trial court granting only one additional peremptory challenge to each of the five defendants, even in light of the extensive publicity on Watergate.
 
 
 36
 In the final analysis the only question is whether defendants were given a fair trial. Three challenges for fifteen defendants is not very generous, and in many cases we might hold this to be insufficient. But we are unwilling to find as a matter of law that three peremptory challenges are too few in the present circumstances. Apparently there was no conflict of interest between the codefendants, they only disagreed over which jurors they thought would be more biased. We hold this is not a showing they were deprived of a fair trial.
 
 
 37
 Defendants also argue they should have been entitled to a continuance or venue change in view of the pretrial publicity. This also is in the discretion of the trial judge. Fed.R.Crim.P. 21(a) provides,
 
 
 38
 "The court upon motion of the defendant shall transfer the proceeding as to him to another district whether or not such district is specified in the defendant's motion if the court is satisfied that there exists in the district where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial at any place fixed by law for holding court in that district."
 
 
 39
 See United States v. Gullion, 575 F.2d 26, 28 (1st Cir. 1978). The issue turns on a fact question on the extent of publicity and the proximity in time to the trial. Id.
 
 
 40
 The Supreme Court found pretrial publicity had made a fair trial impossible in Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), when a film showing the defendant making an in-custody confession was broadcast three times in a town of only 150,000 people. But when the publicity, "although massive, (is) neither as inherently prejudicial nor as unforgettable as the spectacle of Rideau's dramatically staged and broadcast confession," there is no reason to conclude prior to voir dire that objectivity was impossible. United States v. Haldeman, 559 F.2d 31, 61 (D.C.Cir.1976), cert. denied, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977). Also, when publicity is about the event, rather than directed at individual defendants, this may lessen any prejudicial impact. See United States v. Evans, 542 F.2d 805, 812 (10th Cir. 1976), cert. denied, 429 U.S. 1101, 97 S.Ct. 1124, 51 L.Ed.2d 550 (1977).
 
 
 41
 When the publicity has been great, however, the judge must be sure that voir dire of the jurors "affords a fair determination that no prejudice has been fostered." Silverthorne v. United States, 400 F.2d 627, 638 (9th Cir. 1968), cert. denied, 400 U.S. 1022, 91 S.Ct. 585, 27 L.Ed.2d 633 (1971). We have examined the voir dire here with a view to determining whether the judge had a reasonable basis for concluding the jurors selected could be impartial, particularly Martin and McConnell. We believe there was a reasonable basis for concluding the jury was fair and impartial, and hence no requirement that the trial be moved because of pretrial publicity. See United States v. Jobe, 487 F.2d 268, 269 (10th Cir. 1973), cert. denied, 416 U.S. 955, 94 S.Ct. 1968, 40 L.Ed.2d 305 (1974).
 
 
 42
 Upon discovering that the card stating "They're Guilty, Nuke'M" had been included in the jury exhibits, the judge asked the following questions of the jury to determine their ability to render fair and impartial verdicts.
 
 
 43
 "Now simply for the sake of the record, I'm going to ask each of you to respond to the question: In your opinion, can you completely and totally ignore the exhibit? Will you completely and totally ignore the exhibit and, in your opinion, after full and careful thought, in your judgment can you render completely fair and impartial verdicts? And my question is, and I ask each of you, can you answer all those questions in the affirmative?"
 
 
 44
 Each juror was polled individually and each responded in the affirmative. The judge then asked,
 
 
 45
 "I will ask if there are any of you, who because of this card or exhibit, would feel in the least uncomfortable in continuing your deliberations to arrive at totally fair and impartial verdicts, and if any of you would feel uncomfortable, will you please raise your hand?"
 
 
 46
 No hands were raised. The court denied the motions for mistrial.
 
 
 47
 The question presented is whether the inclusion of the card in the jury exhibits was so blatantly prejudicial that the verdict must be overturned in spite of the affirmations of the jury. The granting of a mistrial is within the discretion of the trial court and the standard is whether defendant's right to a fair and impartial jury has been impaired. United States v. Evans, 542 F.2d 805, 815 (10th Cir. 1976), cert. denied, 429 U.S. 1101, 97 S.Ct. 1124, 51 L.Ed.2d 550 (1977).
 
 
 48
 This is not a case in which additional evidence gets into the hands of the jury. Therefore, Bulger v. McClay, 575 F.2d 407 (2d Cir. 1978), relied upon by the defendants, is not directly on point. In United States v. Evans, 542 F.2d 805 (10th Cir. 1976), cert. denied, 429 U.S. 1101, 97 S.Ct. 1124, 51 L.Ed.2d 550 (1977), a juror had received a letter signed with the name of one of the defendants, the courtroom received a bomb threat during trial, and a defense witness assaulted a juror. After each incident the judge questioned the jurors and they responded they could act impartially. This Court found the trial court's denial of a mistrial there was not an abuse of discretion. The incidents in the present case seem no more prejudicial; we do not find any abuse of discretion here.
 
 
 49
 For the reasons set forth above and for the reasons set forth in United States v. Seward and United States v. Thompson, the judgments are affirmed.
 
 APPENDIX A
 
 50
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 TABLE