**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**CATTLE KING PACKING CO., INC.,**
**Rudolph G. "Butch" Stanko, and**
**Gary Waderich, Defendants-Appellants.**

Nos. 84–2435, 84–2436, 84–2454, 85–2532, 85–2533 and 85–2534.

United States Court of Appeals,
Tenth Circuit.

June 6, 1986.

234

Mark Wielga (Kevin Michael Shea of Roath & Brega, P.C., Denver, Colo., and Roger C. Elletson, Cheyenne, Wyo., with him on brief), Denver, Colo., for Cattle King Packing Co., Inc., and Rudolph G. "Butch" Stanko, defendants-appellants.

Robert T. McAllister of Dill, Dill & McAllister, Denver, Colo., for Gary Waderich, defendant-appellant.

Charles H. Torres, Sp. Asst. U.S. Atty. Robert N. Miller, U.S. Atty. and Douglas W. Curless, Asst. U.S. Atty., Denver, Colo., for plaintiff-appellee.

Before BARRETT, ANDERSON, and McWILLIAMS, Circuit Judges.

McWILLIAMS, Circuit Judge.

In a fifteen count indictment, Cattle King Packing Co., Inc., a Colorado corporation, Rudolph G. "Butch" Stanko, Gary Waderich, and others were charged with various violations of the Federal Meat Inspection Act, 21 U.S.C. §§ 601–624, 661–680. Eight of the fifteen counts were dismissed prior to trial. In a joint trial, Stanko, Waderich, and Cattle King were convicted by a jury on all seven of the remaining counts. All three were sentenced and now appeal their respective convictions.

By way of general background, "Butch" Stanko, a resident of Scottsbluff, Nebraska, on or about June 1, 1981, started a packing plant in Adams County, Colorado, under the corporate name of Cattle King Packing Company, a Colorado corporation. Stanko was an officer and shareholder of the corporation. The operation continued until its closing on or about December 31, 1983. Gary Waderich, one of the three defendants, was a general sales manager of Cattle King and was primarily responsible for commercial sales of meat food products, as well as also being responsible for the daily operation of Cattle King.

The six substantive counts against the three defendants fall into three main categories: (1) the fraudulent distribution of adulterated meat products; (2) the intentional circumvention of federal law requiring an inspection by a federal meat inspector of all shipments returned to Cattle King by dissatisfied purchasers; and (3) the fraudulent misbranding of meat shipments by stamping on the shipment a false production date. The defendants were also charged in a separate count, count 1, with conspiring to do, *inter alia,* the acts described in the six counts charging the substantive offenses.

It was the government's theory of the case that at the time Butch Stanko founded Cattle King, it was his intent to circumvent the provisions of the Federal Meat Inspection Act wherever possible, and that before returning to his home in Scottsbluff, Nebraska, in February, 1982, he set company policies and practices designed to violate federal law. These policies and practices he then passed on to his employees, including Gary Waderich, with instructions that such be followed. Although defense counsel would make much of the fact that Stanko returned to Scottsbluff, Nebraska, in February, 1982, and was not thereafter in the Adams County plant on a regular basis, it is nonetheless the government's position, in this regard, that Stanko, from Nebraska, monitored the packing operation by phone calls and occasional visits to the plant to make certain that the policies and practices which he had installed were in fact being followed. In support of its theory of the case, the government called some forty witnesses, including federal meat inspectors and several former employees of Cattle King.

In this court, Cattle King and Stanko are represented by the same counsel, and Waderich is represented by separate and different counsel. However, certain matters are urged by all three defendants. We will deal with these issues first.

I.

All defendants argue that the district court erred in refusing to grant a change of venue under Fed.R.Crim.P. 21 based on massive pretrial publicity which precluded a fair trial. In support of a pretrial motion for a change of venue, defendants offered a survey indicating that a high percentage of the people interviewed had heard about the case and that most believed the defendants to be guilty. We will concede that there was considerable pretrial media publicity concerning the case. Such, however, does not in and of itself dictate a change of venue. The critical issue is whether such publicity resulted in *actual* prejudice. *See United States v.*

*Hueftle*, 687 F.2d 1305, 1310–11 (10th Cir. 1982). Our study of the record made upon *voir dire* of the jury convinces us that there was no actual prejudice.

■ It appears that eight of the fourteen jurors who heard the case had not previously heard or read about the case. As concerns the other six, the trial judge carefully explored, in each instance, the possible impact the pretrial publicity had on the jurors' ability to serve impartially. He concluded that each would decide the case on the basis of what he or she heard in the courtroom, and not what he or she had read in the paper or heard on TV. The grant, or refusal to grant, a motion for a change of venue in a criminal case rests within the sound discretion of the trial court, and an appellate court should not reverse a trial court's ruling on the matter unless an abuse of discretion plainly appears. *United States v. Neal*, 718 F.2d 1505, 1510–11 (10th Cir.1983), *cert. denied,* — U.S. ——, 105 S.Ct. 87, 83 L.Ed.2d 34 (1984); *United States v. Hueftle*, 687 F.2d 1305, 1310–11 (10th Cir.1982). We find no abuse of discretion.

## II.

All three defendants claim that the evidence is legally insufficient to support their convictions on any of the seven counts. The standard of review for determining whether there is sufficient evidence to sustain a criminal conviction is as follows: The evidence at trial must be enough to convince a reviewing court that a rational fact finder could conclude that all necessary elements of the crime have been proven beyond a reasonable doubt. *United States v. Powell*, 469 U.S. 57, ——, 105 S.Ct. 471, 478, 83 L.Ed.2d 461 (1984); *United States v. Austin*, 786 F.2d 986, 988 (10th Cir.1986) (petition for rehearing pending). In determining whether the evidence is sufficient, it must be viewed in the light most favorable to the government. *Austin*, 786 F.2d at 988. Thus, in determining whether there is sufficient evidence to sustain the defendants' convictions, we only need look to see whether there is enough evidence in the record which, if believed, could lead to a rational conclusion that each element of each count had been proven beyond a reasonable doubt. We shall consider each count separately.

### A.

Count 1 charges Cattle King, Stanko, and Waderich with conspiring with themselves and others to violate the Federal Meat Inspection Act. A description of what constitutes a conspiracy is found in our opinion in *United States v. Kendall*, 766 F.2d 1426 (10th Cir.1985), *cert. denied,* — U.S. ——, 106 S.Ct. 848, 88 L.Ed.2d 889 (1986), to wit:

A conspiracy is a combination of two or more persons acting in concert to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. The evidence must show circumstances to warrant a jury finding that the conspirators had a unity of purpose or a common design and understanding.... In a conspiracy prosecution, the critical inquiry is whether the circumstances, acts, and conduct of the parties are of such a character that the minds of reasonable men may conclude therefrom that an unlawful agreement exists.... The conspiracy is complete "when one or more of the conspirators knowingly commit an act in furtherance of the object of the agreement." ... The agreement need not be shown to have been explicit. It may be inferred from the facts and circumstances of the case.

*Id.* at 1431 (citations omitted) (dealing with whether there was sufficient evidence to sustain a conspiracy conviction). *See also United States v. Buchanan*, 787 F.2d 477, 487–88 (10th Cir.1986) (also dealing with whether there was sufficient evidence to sustain a conspiracy conviction). Our study of the record convinces us that there is ample evidence to support the conviction of the three defendants on the conspiracy charge.

First, with respect to defendant Stanko, there is substantial evidence that he initiated the conspiracy. Illustrative thereof,

and by way of example only, is the testimony of three former employees regarding instructions given them by Stanko at a time when Stanko was in charge of the day-to-day operation of the plant. Bruce Ryan testified that on one occasion when the packing plant was just getting started, a shipment of meat was rejected by an east coast consignee and returned to Cattle King "without the benefit of federal inspection." On this occasion, according to Ryan, Stanko instructed Ryan and a fellow employee to come down on Sunday and "rework" the meat, but "don't let anybody else know about it." Ryan testified the shipment was "reworked" on a Sunday morning and readied for resale.

Larry Andrews, another former employee testified that when Stanko was still running the day-to-day operation of the plant, Stanko gave him directions, which he followed, on how, when the "inspector wasn't around," to mix "inedible scrap" with edible meat and thereby enhance the poundage of the salable meat. Andrews also testified that he had discussions with Stanko regarding ways to get returned meat into the plant without federal inspection.

Similarly, Gary Tuck, another former employee, testified that in August or September 1981, Stanko established a firm policy that no federal meat inspector was to be allowed to inspect returned meat without Stanko or some other Cattle King official authorizing it.[1] Clearly such testimony is evidence of a conspiracy involving Stanko, Ryan, Andrews, and Tuck.

There is similar testimony involving Waderich, who was charged with carrying out the policies and practices set by Stanko. As set out in our discussion of the substantive counts immediately below, there is considerable testimony that Waderich was directly involved in all of the substantive violations of the federal meat inspection laws. We find, therefore, that there is sufficient evidence showing a conspiracy to violate federal meat inspection laws involving Stanko, Cattle King and Waderich, to uphold their conspiracy convictions.

**B.**

Count 3 charged the defendants with causing, on February 12, 1983, a shipment of meat, which was returned to Cattle King by Western Grocers of Albuquerque, New Mexico, to be brought back into the plant without inspection by a federal meat inspector, and with an intent to defraud. Larry Andrews, a former Cattle King employee, who cooperated with the government investigation, testified that he and Gary Tuck, a co-employee, were instructed by Waderich to rebox the meat without inspection. Andrews went on to further testify that they were attempting to rebox the meat, which had not been inspected, when a government veterinarian came on the scene and demanded to know what was going on. When the matter was presented to Waderich, according to Andrews, Waderich disclaimed all knowledge. The meat in question was later thrown out. Still later, when Andrews and Waderich were discussing the matter, Waderich reportedly commented, "well, we tried, but we got caught."

The government veterinarian referred to in the preceding paragraph testified as a government witness and generally corroborated Andrews' testimony concerning the February 12 incident. Further, Tuck, Andrews' co-employee, testified in great detail concerning the meat returned from Western Grocers. Tuck testified that Waderich directed the entire operation of bringing the meat back into the plant, avoiding federal inspection, and "reworking" the meat which included punching holes in bags of meat which were puffy due to bacterial gas buildup.

We find that there is sufficient evidence that Waderich directed the illegal circumvention of federal inspection when the

---

**1.** Almost a year later, Gary Tuck tried to back down from his testimony at trial that Stanko told him that no meat was to be inspected without Stanko's or some other officer's approval. This supposed recantation formed the basis for a new-trial motion by the defendants. As we discuss in more detail below, we find Tuck's alleged recantation to be highly suspect.

Western Grocers' shipment was returned to sustain the convictions on count 3.[2]

### C.

Counts 4 and 6 relate to a meat shipment to Nobel-Sysco in May, 1983. Count 4 charges the defendants with "misbranding" meat by falsely dating the packages. Bruce Ryan, an erstwhile employee of Cattle King testified concerning the general practice of dating meat the day it was shipped, rather than the date of production. Specifically, he recalled and testified about the shipment to Nobel-Sysco, and the misdating, at Waderich's direction, of that particular shipment of meat.

Count 6 charged the defendants with causing the meat rejected by Nobel-Sysco to be brought back into the Cattle King plant, without federal inspection, and with the intent to defraud. The facts and circumstances surrounding the meat shipment returned by Nobel-Sysco strongly suggest that there was no inspection of the meat upon its return to Cattle King. Andrews testified that the bags containing the meat were "puffy" with gas caused by spoilage, and that on instruction from Waderich, the bags were "poked" to let the gas escape, and the meat was then reshipped to Nobel-Sysco the next morning. Kim Gillespie, another Cattle King employee, testified that Waderich himself had told her that the Nobel-Sysco shipment had been returned in "bad condition" and that he, Waderich, had directed that the meat be "reworked" by punching holes in the bags, and that the meat was reshipped to Nobel-Sysco. Chris Ronson, an employee of Nobel-Sysco, testified that Nobel-Sysco marked the boxes of meat that it first rejected, and that the same boxes were reshipped to Nobel-Sysco, thus indicating that Nobel-Sysco received the same meat. Certainly the totality of the circumstances shows that there was no federal inspection of the meat returned from Nobel-Sysco.[3] We find, therefore, that there is sufficient evidence to sustain the defendants' convictions on counts 4 and 6.

### D.

In count 9, the defendants were charged with shipping adulterated meat products to California Provisions on August 10, 1983. The evidence concerning this transaction is that the meat in question was first shipped by Cattle King to a company in North Carolina, which company rejected a big part of the shipment because of spoilage. The rejected meat was returned to a Cattle King storage facility in Nebraska, and from there shipped to California Provisions. Witnesses Coffey, Randall, Kim Gillespie, Wilson, and Stephenson testified about this particular transaction. For example, Wilson, the trucker who picked up the meat sold to California Provisions from the Nebraska ice house, testified that the meat was packed in dilapidated boxes and that it "had a funny-looking color and it just—it had a bad smell to it." Also, Stephenson, an employee of S & L Meats, the company which purchased the Cattle King meat from California Provisions, testified that when he received the meat from the trucker, it looked bad, and when the meat was thawed, it was spoiled and unfit for human consumption.

Gary Waderich personally inspected the product and ordered that it be resold. It is, therefore, reasonable to conclude that if the shipment of meat to California Provisions was "adulterated," and there is evidence that it was, then Waderich sold this "adulterated" meat intentionally. We find the testimony sufficient to show that adulterated meat was shipped by

---

**2.** For further discussion on Stanko's guilt on this and the remainder of the substantive counts, see part III, *infra*. For further discussion on Cattle King's guilt on the substantive counts, see part IV, *infra*.

**3.** The testimony of a number of witnesses shows that Cattle King employees were well-aware of the procedure established by the company to comply with federal law, that is, that returned meat was to be placed in a specific designated area for reinspection. None of the testimony concerning this incident indicates that the returned meat was handled in accord with the proper procedure.

Cattle King to California Provisions at the direction of Gary Waderich.[4]

### E.

In count 12, the defendants were charged with preparing meat products from May 1, 1983, through June 30, 1983, with an intent to defraud, which products were adulterated in that plastic cry-o-vac tubes used for packaging the meat had been punched with holes to allow gas to escape. This particular count is referred to by the parties as the King Soopers transaction. In this regard, there was substantial evidence, through the testimony of Bruce Ryan, Larry Andrews, and Gary Tuck, that meat sold to King Soopers was returned because of spoilage, was "reworked," and then, according to witness Tuck, reshipped, all at the direction of Gary Waderich. We find sufficient evidence to sustain the convictions on count 12.

### F.

In count 13, the defendants were charged with selling misbranded, that is, misdated, meat products on March 14, 1983, to Fairfield Farms in Capitol Heights, Maryland. Fairfield Farms is a subsidiary of the Marriott Corporation. The testimony of witnesses Ron Edelmann, a Marriott employee, and that of Andrews and Ryan, establishes, *prima facie,* that the meat was stamped as of the date of shipment, rather than the date of production as required by Marriott. The fraudulent intent of Waderich is confirmed by Ryan's testimony. Ryan described one situation when Marriott did a quality control check of the Cattle King plant. To keep Marriott from discovering that Cattle King was stockpiling Marriott's meat, Waderich told Ryan to make sure that someone dated the boxes of meat that were already being stored in the cooler.

■ In sum, the facts and circumstances are such that, in our view, there is sufficient evidence to support the jury's verdicts on all the counts. There is little doubt that Cattle King's operation violated federal meat inspection law at about every turn. Cattle King employees shipped adulterated meat, misdated the meat so as to give the consignee an erroneous understanding as to the production date, and evaded federal inspection when rejected meat was returned to the plant. Cattle King employees also "reworked" the returned meat and resold it. Because this activity directly involved Gary Waderich, his challenge of the sufficiency of the evidence must clearly fail. As for the challenges of Stanko and Cattle King, they will be addressed in the next two parts of this opinion.

### III.

■ Stanko formed Cattle King in June, 1981, and for about eight months thereafter was in charge, on a day-to-day basis, of the plant and its operation. It was during this time, according to government witnesses, that Stanko established the policies and practices of the company out of which the present proceedings arose. Stanko returned to his residence in Scottsbluff, Nebraska, in February, 1982, and though he kept in touch with the plant, the

---

**4.** On a related matter, Waderich challenges his conviction on Count 9 on the basis that Colorado was an improper venue for the trial on this count. He argues that none of the alleged crime took place in Colorado. Under the Constitution, as embodied in Fed.R.Crim.P. 18, an accused has a right to be tried in the federal district in which the crime was committed. However, under 18 U.S.C. § 3237, any crime "against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed." Under this statute, venue lies in any district used to commit the crime. *United States v. Jackson,* 482 F.2d 1167, 1178 (10th Cir.1973), *cert. denied,* 414 U.S. 1159, 94 S.Ct. 916, 39 L.Ed.2d 111 (1974). The sale of the meat to California Provisions was made by telephone in Colorado by Kim Gillespie at the orders of Gary Waderich. Certainly the crime began in Colorado. Colorado, therefore, under 18 U.S.C. § 3237, is the proper venue for trying Count 9. *Accord United States v. Zwego,* 657 F.2d 248, 251 (10th Cir.1981), *cert. denied,* 455 U.S. 919, 102 S.Ct. 1275, 71 L.Ed.2d 460 (1982) (proper venue for making false statements ruled proper, *inter alia,* in place where statement originated).

day-to-day supervision of the plant was turned over to others, particularly Gary Waderich, who was instructed to follow the practices prescribed by Stanko, which included misdating of meat, shipping of adulterated meat, and by-passing federal inspection of meat returned to the plant by dissatisfied purchasers. Notwithstanding, counsel for Stanko would make much of the fact that Stanko returned to Scottsbluff, Nebraska, in February, 1982, and, in this regard, points out that all of the substantive charges, as opposed to the conspiracy charge, occurred after the date Stanko returned to Nebraska. Counsel would have us believe that Stanko was somehow insulated from transactions occurring in Adams County, Colorado, when he, Stanko, was in Nebraska. This, in our view, is an overly simplistic view of the matter. All defendants were charged, *inter alia,* with being aiders and abettors under 18 U.S.C. § 2, and the jury was instructed that whoever aids, abets, counsels, commands, induces, or procures the commission of a criminal act by another is himself punishable as a principal. The fact that Stanko was in Scottsbluff does not absolve him of the criminal acts, for example, of Waderich, which were committed pursuant to instructions from Stanko himself.

As a variation on his "I-was-in-Scottsbluff" defense, Stanko charges that the giving of Instruction No. 42 was error. Instruction No. 42, which is based upon the instruction at issue in *United States v. Park,* 421 U.S. 658, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975), can, according to Stanko, only be used in misdemeanor cases. *Park,* however, cannot be read so narrowly. *Park* clearly shows that an instruction like No. 42 is proper when the defendant is a corporate officer, and the crime alleged is a violation of some law designed to insure

that food and drugs are safe. There is nothing in the *Park* decision limiting its scope to misdemeanors.

The applicability of *Park* to our case is readily apparent. Although the substantive crimes in *Park* involved violations of the Federal Food, Drug, and Cosmetic Act, not the Federal Meat Inspection Act, the criminal provisions of both are strikingly similar. Both make violations a misdemeanor while providing for the same stiffer felony penalty if any violation is committed with the "intent to defraud."[5] More important, both laws were passed to insure that food sold to the American public is safe. In addition, the very issue resolved in *Park* was whether a nearly identical jury instruction to No. 42 was properly given in the trial of a president of a company engaged in the food business. *See* 421 U.S. at 665, 95 S.Ct. at 1908.

■■■ The rationale of the Supreme Court's decision in *Park* is based upon this premise: Companies that engage in the food business, and the people who manage them, have an affirmative duty to insure that the food they sell to the public is safe. *See id.* at 670–73, 95 S.Ct. at 1910–12. Accordingly, a corporate officer, who is in a "responsible relationship" to some activity within a company that violates federal food laws, can be held criminally responsible even though that officer did not personally engage in that activity. *Id.* at 673–74, 95 S.Ct. at 1912–13. Consistent with the rationale of *Park,* Instruction No. 42 gave the jury the opportunity to decide whether Butch Stanko was responsible for Cattle King's violations of federal meat inspection laws. The jury found that he was.

The statute at issue in *Park* permits a felony sentence if the violation charged is

5. The Food, Drug, and Cosmetic Act provides that notwithstanding the provision making a violation a misdemeanor, if someone "commits such a violation with the intent to defraud or mislead, such person shall be imprisoned for not more than three years or fined not more than $10,000 or both." 21 U.S.C. § 333(b). *See Park,* 421 U.S. at 666 n. 10, 95 S.Ct. at 1908 n. 10.

The Federal Meat Inspection Act provision under which Stanko was charged makes a violation a misdemeanor, "but if such violation involves intent to defraud ..., [a person violating the Act] shall be subject to imprisonment for not more than three years or a fine of not more than $10,000, or both." 21 U.S.C. § 676(a).

committed with an "intent to defraud." In *Park*, however, the defendant was not charged with a felony, but rather with a misdemeanor. The issue of whether the defendant in *Park* could be convicted under the felony provision of that statute, therefore, was not before the Court. Instruction No. 42, therefore, without more, would not be sufficient to find Stanko guilty of a felony.

■ Instruction No. 42, nevertheless, is sufficient to put to the jury the issue of Stanko's criminal responsibility for Cattle King's meat inspection violations. So long as the jury was instructed that it must also find that Stanko had the "intent to defraud," the jury instructions were proper and Stanko's challenge on this basis must fail.

It is axiomatic that jury instructions are not to be read in isolation, but rather are to be considered as a whole. *Park*, 421 U.S. at 674, 95 S.Ct. at 1912–13. Instruction No. 45 specifically charges that for all counts except count 9, "the crimes charged in this indictment require proof of specific intent before the defendants can be convicted." [6] Contrary to Stanko's arguments, Instruction No. 45 complements Instruction No. 42 rather than contradicts it. Moreover, each jury instruction of each substantive count except count 9 contains the charge that the jury must find that "the defendant acted with the intent to defraud." Each such instruction also charges that the jury is to evaluate "[t]he question [of guilt] as to each defendant considered separately." It is fair to conclude that a reasonable juror, so instructed, would believe that he or she must find that Stanko had the "intent to defraud" before finding him guilty of the felony charges. *See Sandstrom v. Montana*, 442 U.S. 510, 514, 99 S.Ct. 2450, 2454, 61 L.Ed.2d 39 (1979). As discussed above, particularly in our discussion of the conspiracy count,

there is sufficient evidence that Stanko had such intent.

In sum, we find no reversible error in the giving of Instruction No. 42. That instruction must be read in connection with all the instructions. We find that Instruction No. 42 can be used to put to the jury the issue of Stanko's responsibility for Cattle King's Meat Inspection Act violations. And, it can be used to find him guilty of a felony, so long as the jury was properly instructed, as it was in this case, that it must find that Stanko had the requisite "intent to defraud." In any event, this is not an instance where Stanko was in Scottsbluff, Nebraska, *not* knowing what his employees were doing in Adams County, Colorado. Rather, the evidence is that Stanko set in motion the very acts which were carried out, pursuant to direction, by his employees, clearly a form of aiding, abetting, ordering, commanding, or inducing. 18 U.S.C. § 2. Scottsbluff is not a shield for Stanko.

### IV.

■ The trial court instructed the jury that Cattle King could be found guilty only if one of its agents committed the crime charged, and three other elements were met:

1. The agent was acting within the scope of his or her employment;

2. the agent was authorized to do the act;

3. the agent was motivated, at least in part, to benefit the corporation.

Jury Instruction No. 27. As discussed above, Gary Waderich, an officer of Cattle King, was personally responsible for the commission of all the substantive counts, and he is certainly guilty under the conspiracy charge. Given Waderich's position within Cattle King, there is no doubt that elements 1 and 2 are met. As for element 3, there also is no doubt that Cattle King

---

**6.** Note that this language in Instruction No. 45 says "defendant*s*." There were only three defendants tried, Stanko, Waderich, and Cattle King. It is unlikely that a reasonable juror would conclude that this instruction did not apply to Stanko. *See Sandstrom v. Montana,* 442 U.S.

510, 514, 99 S.Ct. 2450, 2454, 61 L.Ed.2d 39 (1979) ("whether a defendant has been accorded his constitutional rights depends upon the way in which a reasonable juror could have interpreted the instruction.")

benefitted by the commission of these crimes. The principal effect of all the crimes committed was that Cattle King reaped great economic rewards. Selling meat which should have been condemned, misdating boxes so that meat could be stockpiled and thus produced more cheaply, all directly benefitted Cattle King economically. There is, therefore, sufficient evidence that Cattle King, as a company, is also guilty of all of the above-discussed crimes.

## V.

■ Stanko and Cattle King, but not Waderich, argue that their convictions should be reversed because of the admission of hearsay evidence in violation of Fed.R.Evid. 104 and 801(d)(2)(E). The testimony complained about is testimony concerning acts and statements made outside the presence of Stanko by co-conspirators in furtherance of the conspiracy. Under such cases as *United States v. Andrews*, 585 F.2d 961 (10th Cir.1978) and *United States v. Petersen*, 611 F.2d 1313 (10th Cir.1979), *cert. denied*, 447 U.S. 905, 100 S.Ct. 2985, 64 L.Ed.2d 854 (1980), a trial court, prior to the admission of such testimony, must itself make a factual determination, *inter alia*, that other evidence shows a conspiracy between the declarant and the defendant. Counsel suggests that the trial court's finding in this regard is insufficient in that it was conclusory and not really factual. We disagree. The trial court in so many words found that there was sufficient, substantial, and independent evidence of a conspiracy between the defendants and others. The fact that the trial court did not pinpoint the evidence is not fatal. *See United States v. Buchanan*, 787 F.2d 477, 481–83 (10th Cir.1986).

## VI.

■ Stanko was sentenced to four years imprisonment on the conspiracy conviction, which is longer than the maximum sentence which could be imposed on any of the six substantive charges, i.e., three years. Counsel for Stanko argues that the legislative intent behind 18 U.S.C. § 371 does not contemplate imposition of a conspiracy sentence which is longer than that which could be imposed for the underlying substantive violation. We disagree. Under the facts of this case, the conspiracy offense and the completed substantive offense are separate crimes and a separate sentence may be imposed in connection with each. *Ianneli v. United States*, 420 U.S. 770, 777–78, 95 S.Ct. 1284, 1289–90, 43 L.Ed.2d 616 (1975); *United States v. Davis*, 578 F.2d 277, 280 (10th Cir.1978). It has long been the rule that Congress has the power to provide for persons convicted of conspiracy a punishment more severe than that provided for persons actually committing the act. *Clune v. United States*, 159 U.S. 590, 594–95, 16 S.Ct. 125, 126–27, 40 L.Ed. 269 (1895). And such, in our view, is the legislative intent behind 18 U.S.C. § 371 which fixes the maximum imprisonment for a conspiracy conviction at five years, unless the object of the conviction is only a misdemeanor.

In *Hunsaker v. United States*, 279 F.2d 111 (9th Cir.), *cert. denied*, 364 U.S. 819, 81 S.Ct. 52, 5 L.Ed.2d 49 (1960), the Ninth Circuit held that the penalty provided for in 18 U.S.C. § 371, i.e., a $10,000 fine or imprisonment for five years, or both, applied where the object of the conspiracy was not a misdemeanor and the penalty for the object of the conspiracy was a civil suit only. The Ninth Circuit explained that this apparent inconsistency necessarily results from the plain language of § 371:

> Whatever incongruity there may be in imposing a greater penalty for a conspiracy to commit an offense against the United States which is neither a felony nor a misdemeanor than would be the penalty had the offense against the United States been a misdemeanor only, is a matter for Congress to consider. The language it used admits of no debate.

*Id.* at 113 (citation omitted). Imposing a four-year conspiracy sentence on Stanko when the underlying offenses are felonies is clearly within the scope of § 371.

## VII.

All defendants assert that the trial court erred in either denying their request that they be allowed to question jurors, or, in the alternative, by refusing to conduct an evidentiary hearing concerning possible misconduct by the jury. At the time the verdicts were returned, the trial court polled the jurors on an individual basis and each agreed that he, or she, had returned guilty verdicts on all counts against all defendants.

■ After the jury was discharged from the case, the media interviewed certain jurors, and out of those interviews emerged the fact that one juror had previously worked in a meat packing plant, which fact had not been elicited in *voir dire* examination. Counsel argues that the trial court erred in not making inquiry into this matter. We disagree. This is not an instance where the juror gave an erroneous answer to *voir dire* inquiry. The present employment of the juror in question was that of truck driver. He was not asked if he had ever been employed in a packing plant, though he and the other prospective jurors were asked if any member of their family was presently working in a packing plant. The fact that the juror had at some prior time worked in a packing plant, which was not brought out in *voir dire*, does not justify a full-blown post-trial inquiry. *Greenwood v. McDonough Power Equipment, Inc.*, 687 F.2d 338 (10th Cir.1982), *rev'd*, 464 U.S. 548, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984), *opinion on remand*, 731 F.2d 690 (1984) (effectuating Supreme Court decision, reversing earlier decision by this court, that supposed erroneous answer by one juror to material question on *voir dire* did not warrant granting a new trial). In our view, this is a trivial matter.

■ Another juror, sometime after she had been discharged from jury service, wrote a letter to counsel for Waderich, commending him for his excellent job of defending Waderich. She stated that she had "mixed emotions" about the matter,

that she did not base her verdict on the testimony of former employees of Cattle King, and hoped that Waderich would not "serve time." In our view, the letter is rather innocuous and certainly insufficient to require the trial court to make inquiry of the juror. Jurors may, at times, feel sorry for a defendant even though they voted to convict the defendant of the crime charged. The fact of the former, however, does not in any wise vitiate the latter. We, therefore, affirm the trial court's decision refusing to conduct a hearing on the thin allegations of jury misconduct.

## VIII.

Subsequent to their convictions and sentencing, defendants filed a motion for a new trial based on newly discovered evidence. The district court held an evidentiary hearing on the matters raised in the motion. At the conclusion of the hearing, the district judge, from the bench, denied the motion and detailed his reasons for so doing.

At the trial of this case, Gary Tuck, a former employee of Cattle King, testified as a government witness. He was one of several former employees of Cattle King so testifying. On July 30, 1985, Gary Tuck wrote a 23-page letter to Stanko, which counsel contends constituted a recantation by Tuck of his testimony at trial. The motion for new trial was based on both Tuck's July 30 letter to Stanko and on alleged withholding of exculpatory materials.[7]

At the hearing on the motion for new trial, Tuck's July 30 letter to Stanko was received in evidence. At or about the time of the hearing on the motion for new trial, it was discovered that Tuck had also written a 3-page letter to Stanko on July 23, 1985. This letter was also received into evidence.

Three witnesses testified at the hearing on the defendants' motion for a new trial, including Gary Tuck and Kathy Miller, the latter having been married to Tuck when

---

**7.** The alleged exculpatory materials are psychi- atric records of Gary Tuck.

he was employed at Cattle King. At this hearing, "Butch" Stanko appeared both *pro se,* and, at the same time, was assisted by retained counsel. Stanko did not testify, as such, at the hearing, but he did conduct much of the examination of the three witnesses.

From the record, we learn that Tuck was arrested on an assault charge and placed in jail in Scottsbluff, Nebraska. A few days before he wrote his first letter to Stanko, Stanko visited Tuck in the Scottsbluff jail, and, as a result of that visitation, Tuck wrote the July 23 letter to Stanko. That letter commenced with a recitation that Tuck was surprised and appreciative of the fact that Stanko would take the time to seek him out. The July 23 letter closed with the following statement: "Butch, I don't know what I can do but if there is anything I can do to help, I will."

Stanko thereafter visited Tuck at least one more time in the Scottsbluff jail, and it was in this setting that Tuck wrote the letter of July 30, which triggered the filing of a motion for new trial.[8] This sequence of events leading up to the July 30 letter was viewed with some suspicion by the district court, a suspicion which we share.

Counsel for the defendants assert that Tuck's July 30 letter constitutes a full and complete repudiation of his testimony given at trial. Contrarily, the government argues that the July 30 letter is not a true recantation, and, in many respects, parallels Tuck's trial testimony. We need not resolve this dispute, inasmuch as Tuck testified, at length, at the hearing on the motion for new trial. At that time, Tuck testified that his testimony at trial was correct in all details, except one. The one exception, which the district judge did not accept, related to one statement made by Butch Stanko concerning Cattle King's policy for avoiding inspection of returned meat. Further, Tuck testified that, in fact, he was not "pressured" in any manner by government officials.

As indicated, Kathy Miller, an ex-wife at the time of the hearing, testified concerning certain statements made to her by Tuck concerning governmental "pressure," and she also stated that Tuck had told her on several occasions that Stanko had done nothing illegal. During the course of her interrogation, Kathy Miller stated that Tuck had undergone some psychiatric treatment in August and September, 1981. She added that Tuck, who had been married about six times, never could tell the truth, especially about his numerous affairs of the heart. Counsel, based on Miller's testimony, then orally asked for a new trial on the ground that the prosecution had withheld from defense counsel, contrary to the dictates of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the fact that Tuck had received psychiatric treatment in August and September, 1981.

At the conclusion of the hearing, the district court denied the motion for a new trial and stated, in detail, its reasons for so doing. The district court found that the prosecution had no *Brady* material in its possession concerning any psychiatric treatment given Tuck. It is unclear whether the trial court based its ruling that there was no *Brady* material on the basis that the material itself was not exculpatory, or on the basis that the government did not have the material in its possession. In either case, we find that Tuck's psychiatric records, at best, had only marginal impeachment value, and that it was not error for the trial court to refuse to grant a new trial based upon any alleged failure of the government to turn the records over to the defense. *United States v. Latimer,* 780 F.2d 868, 870 (10th Cir.1985) (when defendant only generally requests exculpatory material, appellate court will reverse only if omitted evidence creates a reasonable doubt that did not otherwise exist) (citing *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)). *See also United States v. Bagley,* —— U.S.

---

8. Counsel for the defendants, on August 5, 1985, took a sworn statement from Tuck in the Scotts- bluff jail, in the course of which Tuck read his July 30 letter, verbatim.

——, 105 S.Ct. 3375, 3380–85, 87 L.Ed.2d 481 (1985) (under view articulated by Blackmun, J., joined by O'Connor, J., or view articulated by White, J., joined by Burger, C.J., and Rehnquist, J., a defendant must show that withheld information, if disclosed, would lead to a different result).

 As concerns the July 30 letter, the district court doubted that, standing alone, it would itself justify a new trial, but found that Tuck's testimony at the hearing overrode and controlled any possible statements to the contrary in his July 30 letter. In sum, we find no abuse of discretion by the district court when it denied the motion for new trial. In support of our decision, we refer to our two opinions in *United States v. Ramsey.* In *Ramsey I*, 726 F.2d 601 (10th Cir.1984), the government's principal witness,[9] subsequent to trial, recanted. At trial, the witness had testified that the defendant in *Ramsey* hired him to destroy a building. After conviction, the witness executed an affidavit wherein he stated that the defendant had nothing to do with the destruction of the building. We reversed and remanded with the direction that the trial court conduct an evidentiary hearing into the matters raised in the motion for new trial. In so doing, we stated that the requirements for granting a new trial are as follows: " 'The newly discovered evidence must be more than impeaching or cumulative; it must be material to the issues involved; it must be such as would probably produce an acquittal....' " *Id.* at 604 (quoting *United States v. Allen,* 554 F.2d 398 (10th Cir.), *cert. denied,* 434 U.S. 836, 98 S.Ct. 124, 54 L.Ed.2d 97 (1977)).

On remand, the district court in *Ramsey* conducted an evidentiary hearing on the motion for new trial. The recanting witness [10] testified that the statements in his affidavit were incorrect, and that his testimony at trial was correct. The district court denied the motion for new trial, and in *Ramsey II*, 761 F.2d 603 (10th Cir.1985),

*cert. denied,* —— U.S. ——, 106 S.Ct. 851, 88 L.Ed.2d 892 (1986), we affirmed. In so doing, we observed as follows:

This case is riddled with recantations and reassertions. On the cold record it is entirely impossible for this court to determine which story is the true version. The district court judge, who took the evidence and personally observed the witness as he testified, was in a much better position than this court to determine whether, even after noting Mr. Jackson's frequent about-faces, his testimony was nonetheless sufficiently credible to support a jury verdict. The district court's determination that there was no valid recantation but merely another flip-flop by the witness adequately justifies a finding that there was no newly discovered evidence justifying a new trial. While such a precarious and vacillating witness is an unstable stand on which to base a conviction, we cannot say that the record justifies overturning the trial court's decision on petition for a new trial.

*Id.* at 604. The allegedly recanting witness in *Ramsey* was far more material than Gary Tuck. In this light, the district court did not err by refusing to grant a new trial based upon Tuck's alleged recantations.

### CONCLUSION

For the above-noted reasons, we find the appellants' arguments without merit.

All judgments are affirmed.

---

**9.** Tuck was an important witness, to be sure, but he was by no means the only witness offering critical testimony. The government called about 40 witnesses in its case-in-chief, including several other former employees of Cattle King.

**10.** The recantation in *Ramsey* was much more clear-cut than Gary Tuck's.